**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **James J. Clark,** | ) | |
| | ) | **Jury trial demanded.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **AAR Corporation, Timothy J. Romenesko and** | ) | |
| **David P. Storch,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff James J. Clark, by his attorneys, Fox, Hefter, Swibel, Levin & Carroll, LLP, complains as follows:

### Introduction

1.     Federal law prohibits an employer from discriminating on the basis of age.  And Illinois law prohibits an employer from forfeiting an at-will employee's earned compensation when terminating the employee's employment without cause.

2.     Jim Clark was employed by the defendant AAR Corp – publicly held company in the aerospace industry – for almost 30 years.  Hired as a staff accountant in 1982, Jim was repeatedly promoted and given merit-based raises.

3.     Jim became an officer of AAR in 2000, a corporate Group Vice President in 2003 and ultimately a candidate for the position of AAR COO in 2007.

4.     On or about May 13, 2010, citing AAR's desire to move Jim out of the way in order to make room for younger people like John Holmes, age approximately 33, who will be with the company for the next 20 years so that AAR could focus on developing them, AAR's President & COO defendant Timothy Romenesko informed Jim that AAR was reducing Jim's

compensation, position and responsibilities and assigning certain of Jim's responsibilities to John Holmes.

5.      Shortly after his conversation with Mr. Romenesko, Jim met with AAR's Vice President of Human Resources, Timothy Skelly, to voice his opposition to AAR's demotion of Jim based on Jim's age. During that meeting, Mr. Skelly admitted to Jim that Mr. Romenesko's comments were clearly a basis for an age discrimination claim.

6.      Within weeks after Jim's meeting with Mr. Romenesko, AAR proposed forfeiting to AAR Jim's previously earned restricted stock awards even if Jim's employment continued to the stock distribution dates and, under the terms of AAR's Stock Benefit Plan, the shares otherwise would have become nonforfeitable.

7.      Jim continued as an AAR employee notwithstanding the wage and responsibility reductions, but did not agree to the proposed restricted stock forfeitures to AAR.

8.      In July 2010, at the direction of AAR's Chairman and CEO defendant David Storch, based on Mr. Storch's "utmost confidence in Jim's ability," Jim undertook a project "of utmost importance to" the United States (as well as AAR). Subsequently, in October 2010, Mr. Storch acknowledged Jim's "fine job...driving [AAR's] improved performance," and, in February 2011, Mr. Storch expressed his appreciation to Jim for a job "Well done!!!"

9.      Nevertheless, four months later, in a June 7, 2011 meeting with Mr. Romenesko and Mr. Skelly, Mr. Romenesko indicated that AAR had no job for Jim anymore.

10.     And two weeks thereafter, in a June 21, 2011 email to Jim's attorney, Mr. Skelly notified Jim that, effective June 20, 2011, AAR had accepted Jim's alleged resignation and terminated his employment.

11.     Jim promptly denied having resigned.  In response, Mr. Skelly alleged that Jim had orally resigned when meeting with Mr. Skelly alone a few days after their June 7, 2011 meeting with Mr. Romenesko.

12.     In addition to terminating Jim's employment effective June 20, 2011, AAR forfeited Jim's fully earned restricted stock awards to AAR based on AAR's claim that whether Jim had resigned or was terminated was "irrelevant" on the issue of the forfeiture to AAR.

13.     AAR also retained and refused to pay Jim his contractually owed severance payments and forfeited his stock options.

14.     In so forfeiting Jim's earned compensation and refusing to pay Jim's severance payments for AAR's benefit, defendants violated Federal age discrimination and Illinois wage payment laws and unjustly enriched AAR.

## Parties, Jurisdiction and Venue

15.     Jim is a 51 year-old individual residing in Chicago, Illinois.  He is a former employee of defendant AAR.

16.     AAR is a Delaware corporation having its principal place of business in Wood Dale, Illinois, in the Northern District of Illinois.  AAR provides various products and services to the worldwide commercial aviation and government/defense industries.  It has more than 20 employees.

17.     Defendant Timothy J. Romenesko is an individual residing, on information and belief, in Barrington, Illinois, in the Northern District of Illinois.  Mr. Romenesko became President and Chief Operating Officer of AAR in June 2007, at all relevant times since has held those positions, and, on information and belief, continues to hold those positions.

3

18.     Defendant David P. Storch is an individual residing, on information and belief, in Glencoe, Illinois, in the Northern District of Illinois.  At all relevant times, Mr. Storch was the Chief Executive Officer and Chairman of AAR and, on information and belief, currently holds those positions.

19.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 29 U.S.C. § 626(c)(1).

20.     Venue is proper in this district under 28 U.S.C. § 1391 because the defendants reside in this district and the wrongful termination of Jim's employment occurred in this district.

## Factual Background

### AAR Hires and Constantly Promotes Jim

21.     AAR hired Jim in 1982 as a salaried staff accountant.

22.     Over the next 28 years, based on its confidence and satisfaction in Jim's performance, AAR repeatedly promoted Jim to a number of different salaried management positions, to Assistant Controller (1984), Controller European Operations (1987), Director of Finance European/Pacific Operations (1992), Vice President & General Manager, Allen Airmotive International (1995), Vice President & General Manager, AAR Aircraft Component Services (1998), Group Vice President, Maintenance, Repair & Overhaul (2000), and to Group Vice President, AAR Aviation Supply Chain (2004).  In 2007, shortly before Mr. Romensko's appointment as corporate COO, Mr. Storch told Jim that Jim would be considered for the position of COO if the position ever opened up.

23.     Throughout Jim's career, in addition to promoting Jim and paying him a salary, AAR consistently gave Jim merit-based raises, rated his job performance as acceptable or better, and selected Jim to participate in all AAR employee benefit programs reserved only for AAR's

senior or key employees, including its Stock Benefit Plan and Supplemental Key Employee Retirement Plan (or "SKERP").[1]

24.     In addition, AAR entered into a Severance and Change in Control Agreement with Jim providing for severance payments and other benefits to Jim upon the termination of Jim's employment without cause.

**AAR's Stock Benefit Plan**

25.     The purpose of AAR's Stock Benefit Plan – attached as Exhibit A – is "to encourage officers and other key employees of the Company who have executive, managerial, supervisory or professional responsibilities and non-employee members of the Board to increase their investment in the Company and to provide additional opportunities to such persons to share in the success of the Company" by awarding stock options and restricted stock to them ("RSAs").

26.     Under the literal terms of the Stock Benefit Plan, however, AAR retains the right to forfeit an employee's fully earned benefits by terminating the employee without cause.

27.     The Stock Benefit Plan provides for (i) the issuance of stock options based on past performance, and (ii) the prospective issuance of RSAs to participating key employees selected by AAR based on meeting targeted future performance.

---

[1] On or about December 28 or 29, 2011, in reviewing the online statement of his account, Jim learned that AAR had forfeited approximately $450,000 of Jim's SKERP benefits. The SKERP is an unfunded "Top Hat" plan and, although generally not subject to ERISA's substantive provisions, is subject to ERISA's procedural rules. Jim thus has appealed the forfeiture through the SKERP's remedial provisions and is not including a wage act or contract claim based on the SKERP forfeiture in this Complaint at this time, but reserves the right to amend the Complaint to do so. Jim believes that AAR's internal review of the forfeiture of his SKERP benefits may be futile and has specifically requested the certain members of the review committee recuse themselves due to conflict of interest. Separately, this complaint does include a request for Jim's forfeited SKERP benefits in the ADEA counts as the administrative remedies for the ADEA claims have already been exhausted.

28.    For the period between January October 1997 and July 2010, AAR granted options to Jim to purchase shares of AAR stock, and 48,479 of those options remain outstanding as of the date of this complaint.

29.    Under the Stock Benefit Plan, if and when the targeted performance goals are met, the RSAs are issued to the employees, but held by AAR for the employees pursuant to the terms of Restricted Stock Agreements (generally in the form attached as Exhibit B).

30.    The participating employees thus become owners of RSAs on issuance with voting and dividend rights even though they do not receive possession of the underlying certificates until the day after the expiration of a Restrictive Period (the "Release Date").

31.    In each of 2006 and 2008, Mr. Storch informed Jim that, if AAR's financial performance met stated goals in the two succeeding fiscal years ending May 31, AAR would issue RSAs to him, (*see* Mr. Storch's letters attached as Exhibits D and E), and based on AAR's having met the stated goals, AAR awarded and issued RSAs to Jim.  On December 22, 2010, AAR awarded and issued an additional 2,500 RSAs to Jim by reason of AAR having met a previously established stock performance standard (of $24.48 a share).  The chart below summarizes the date Jim was notified of each RSA award, the fiscal years covered by the award, the number of shares included in each award and the release date for each award:

| Date of Letter | Fiscal Year(s) | Shares Awarded | No. of Shares/ Release Dates | No. Of Shares Not Released by 6-21-11 |
|---|---|---|---|---|
| 8/11/06 | '07 & '08 | 30,000 | 6000/ 6-1-09 | |
| | | | 12,000/6-1-11 | |
| | | | 12,000/6-1-13 | 12,000 |
| 7/14/08 | '09 & '10 | 35,000 | 7,000/6-1-11 | |
| | | | 14,000/6-1-13 | 14,000 |
| | | | 14,000/6-1-15 | 14,000 |
| 8/12/10 | '10 | 2,500 | 2,500/5-31-13 | 2,500 |

32.     Thus, as of June 20, 2011, based on past performance, AAR had (i) awarded Jim stock options for 48,479 shares of AAR that Jim had not exercised, and (ii) issued a total of 42,500 RSAs to Jim, including voting rights and dividend rights in respect of the shares, which AAR had not released to him.

**Severance and Change of Control Agreement**

33.     The Severance and Change of Control Agreement between AAR and Jim was dated January 14, 2000 and amended December 18, 2008 ("Severance Agreement").   (See Exhibit C.)

34.     The Severance Agreement generally provides for the payment to Jim of a year's salary and a bonus (if then being paid by AAR) on the company's termination of Jim's employment for any reason other than "Cause" as defined in the agreement, *i.e.* (i) engaging in intentionally wrongful behavior, (ii) disobeying a lawful directive from the AAR board, or (iii) breaching the Severance Agreement, including its non-compete provision.

35.     AAR has never claimed that Jim gave it "Cause" to terminate his employment, and Jim did not do so.

36.     The Severance Agreement also provided for severance payments to Jim if Jim quit for "Good Reason" following a Change in Control of the corporation.  "Good Reason" was defined as "a material reduction in the nature or scope of [Jim's] duties, responsibilities, authority, power or function . . . or a material reduction in [his] compensation."

37.     While there has not been a Change in Control, before AAR fired Jim, it materially reduced Jim's duties, responsibilities, authority, power, function and compensation.

**Unenforceable Forfeiture Provisions in AAR's Stock Benefit Plan**

38.     AAR's Stock Benefit Plan provided in pertinent part:

7

**With respect to Stock Options**

An Option Agreement may, in the sole discretion of the Committee, also contain a vesting schedule, a non-competition agreement, a confidentiality provision, provisions for forfeiture and such restrictions, conditions and other terms as the Committee shall determine in its sole discretion. [Section 5.2]

Except as hereinafter provided, no Option or SAR granted pursuant to the Plan may be exercised at any time unless the holder thereof is then an employee or director of the Company. [Section 12.1]

In the case of a Key Employee, the Option or SAR shall lapse immediately upon termination of employment of the Grantee for Cause. [Section 12.5]

**With respect to RSAs**

At the Committee's option, the Restricted Stock Agreement may provide that any Shares of Restricted Stock granted to a Key Employee or Non-Employee Director pursuant to the Plan shall be forfeited to the Company if, among other reasons, (a) the Key Employee or Non-Employee Director violates a non-competition, confidentiality or employment agreement, any Company policy, or any other conditions set forth in the Restricted Stock Agreement or in a separate document, (b) the Key Employee's employment with the Company, or the Non-Employee Director's service on the Board, terminates prior to the date or dates for expiration of the forfeiture provisions set forth in the applicable Restricted Stock Agreement, which date shall not be earlier than the first anniversary of such grant, (c) the Key Employee's employment with the Company terminates for Cause, or (d) there occurs a violation of any provisions of the applicable Restricted Stock Agreement. A forfeiture of Restricted Stock pursuant to this subsection 9.5 shall occur immediately following the mailing of written notice to the Key Employee or Non-Employee Director. Thereafter, the Secretary of the Company shall promptly cancel shares of Restricted Stock that are forfeited to the Company. [Section 9.5]

39. AAR's Stock Option Agreement with Jim provided that "If [Jim's] employment with [AAR] and/or any subsidiary of [AAR] is terminated for any reason, other than for Retirement, death, Disability, or termination of employment for Cause, the Option of [Jim] shall

terminate on the earlier to occur of (i) three months after termination of employment or (ii) the date that the Option expires in accordance with its terms."

40.     AAR's RSA Agreement with Jim provided that "[i]f . . . [Jim's] employment with [AAR] . . . terminates prior to the last day of the Restrictive Period for any reason other than death, Disability or Retirement, [Jim] shall forfeit to the Company all [RSAs] not previously released . . . ." (See Ex. B.)

41.     Thus, the literal terms of the RSA Agreement purported to give AAR the right to terminate Jim for any reason and forfeit his fully earned RSAs, in violation of Illinois law.

**After Almost Three Decades of Service, AAR Spontaneously Demotes Jim**

42.     On May 13, 2010, without any advance notice to Jim, Mr. Romenesko entered Jim's office and told Jim that AAR was lowering Jim's employment position and compensation.

43.     Mr. Romenesko's stated reason for the demotion was that AAR wanted to move Jim out of the way in order to make room for younger people like John Holmes, age approximately 33.

44.     Following that meeting, in a conversation with Timothy Skelly, AAR's Vice President of Human Resources, Jim said that he opposed AAR's demotion of him based on his age.

45.     Mr. Skelly admitted to Jim that Mr. Romenesko's comments about Jim's age were clearly a basis for an age discrimination claim.

46.     AAR wasted no time in implementing Jim's demotion. AAR cut Jim's pay for the pay period following the May 13th meeting, stripped Jim of all his operating responsibility on June 1, 2010.

47.    AAR then gave John Holmes, an approximately 33 year old subordinate of Jim's, Jim's quarterly reporting responsibilities to the Board of Directors and Jim's annual reporting responsibilities to AAR's investor base.

48.    Jim's bonus from AAR for the fiscal year ending May 31, 2010 was materially less than the cash bonus and shares awarded to Jim's peers for that year and typical of the bonus for AAR employees two levels below Jim's position.

49.    Despite these drastic changes, Jim's personnel file contains nothing memorializing the May 13, 2010 meeting between Jim and Mr. Romenesko or documenting any substantive reason for Jim's demotion or reduction in pay.

**AAR Uses the Demotion to Pressure Jim to Give Up His Earned RSAs**

50.    After the May 13, 2010 meeting between Jim and Mr. Romenesko, AAR sought to amend the Severance Agreement to reflect Jim's demotion.

51.    In the first draft of its proposed amendment, AAR included a provision providing for Jim's forfeiture of 80% of his fully earned RSAs if Jim was terminated without cause between June 1, 2010 and May 31, 2011.

52.    Jim refused to agree to or sign the proposed amendment.

53.    In a second (revised) draft, AAR included a provision providing for Jim's forfeiture of almost half of his fully earned RSAs *even if Jim remained an AAR employee through the dates on which the RSAs became distributable and non-forfeitable* under the Stock Benefit Plan and RSA Agreements. AAR thus proposed a minimum forfeiture of half of Jim's earned RSAs, even if Jim's employment with AAR continued.

54.    Jim again refused to sign the proposal. The parties subsequently never agreed to amend the previously (once) amended Severance Agreement.

**Jim Continues to Perform His Duties after His Demotion**

55.     From May 2010 to June 2011, after Jim's demotion, Jim spoke with Mr. Romenesko and Mr. Storch regarding tasks within AAR that Jim could perform.    Mr. Romenesko and Mr. Storch suggested only a few temporary projects that Jim could work on, and did not offer Jim a secure, long-term position with AAR.

56.     One of those projects was regarded by Mr. Storch as being of vital interest to the United States government, involving the supply chain support of KC-10 aircraft for Northrop Grumman and the United States Air Force.    AAR contacted Jim on a Sunday afternoon in order to take over this project on an emergency basis.

57.     Jim promptly took over management of the project, and Mr. Storch informed Jim in July of 2010 that he and Mr. Romenesko had "immense confidence" in Jim's ability to manage the project thoughtfully.

58.     In August of 2010, Mr. Storch told Jim that he had been doing a "great job" and to "keep at it!!", and in February 2011, Mr. Storch expressed his appreciation to Jim for a job "Well done!!"    (See Exhibits F and G.)

59.     Some of the other temporary projects related to Jim's participation in AAR's sale of its facility in Amsterdam and Jim's assistance in developing the accounts of AAR's Singapore-based branch.    Once again Jim was commended on his performance by AAR management.

60.     Despite this indefinite state of Jim's employment – resulting from AAR's failure to suggest a concrete, long-term position for Jim to fill – Jim continued to perform his temporary job duties at AAR at an exemplary level.

**AAR Fires Jim without Cause and**
**Uses the Firing to Deny Jim His Earned Benefits**

61.    In or around October of 2010, AAR began pressuring Jim to resign his positions with all AAR subsidiaries.

62.    Despite requests for his resignation, Jim did not resign.

63.    Subsequently, in a June 7, 2011 meeting among Mr. Romenesko, Mr. Skelly and Jim, Mr. Romenesko claimed that AAR did not have a suitable job for Jim anymore, although in reality Jim was qualified and able to perform any number of jobs at AAR.

64.    Mr. Romenesko made clear at the meeting that if Jim wanted to stay with AAR, he would have to suffer an even greater pay cut and decrease in job responsibilities than had already occurred.  No agreement was reached at that meeting.  After Mr. Romensko left the meeting, Mr. Skelly suggested to Jim that Jim should not come into the corporate office in order to give Mr. Skelly an opportunity to resolve the matter.

65.    Jim took Mr. Skelly's advice and worked remotely from approximately June 13, 2011 to June 21, 2011.

66.    In a June 21, 2011 email to Jim's attorney, Mr. Skelly notified Jim that, effective June 20, 2011 AAR had accepted Jim's alleged resignation and terminated Jim's AAR employment.

67.    Through his attorney, Jim replied immediately, denying that he had resigned. Nevertheless, shortly thereafter, AAR told Jim to clear out his office and removed Jim from AAR's payroll as of June 20, 2011.

68.    AAR also forfeited all of Jim's unreleased RSAs based on AAR's claim that Jim no longer was employed by AAR.

12

69.     At no time during Jim's employment with AAR did Jim perform any act that would constitute cause for termination under any agreement between Jim and AAR.

70.     To date, AAR has not paid Jim any of his severance payments.

71.     As of the date of this complaint, AAR has divested Jim of his unreleased RSAs and stated it is treating those RSAs as forfeited (to AAR) and will never release them to Jim.

72.     AAR has also forfeited Jim's 48,479 unexercised stock options.

**Exhaustion of Administrative Remedies**

73.     On October 21, 2011, Jim filed Charge No. 440-2012-00317 against AAR, asserting the acts of discrimination and retaliation indicated in this Complaint, with the Equal Employment Opportunity Commission ("EEOC"). A copy of the charge is attached to this Complaint as Exhibit H.

74.     More than 60 days have elapsed since Jim filed his Charge with the EEOC, which according to 29 U.S.C. § 626(d), gives Jim the right to bring this civil action to address AAR's age discrimination.

75.     In addition, on December 21, 2011, the EEOC issued its Notice of Right to Sue, which Jim received on or about December 22, 2011.

**Count I – Illinois Wage Payment and Collection Act**
**(Against All Defendants)**

76.     Jim re-alleges and incorporates by reference paragraphs 1-75 above as if fully stated herein.

77.     The Illinois Wage Payment and Collection Act ("Wage Act"), 820 ILCS 115/1 et seq., provides that every Illinois employer "shall pay the final compensation of separated employees in full," which includes "earned bonuses" of the separated employee.

13

78. Section 13 of the Wage Act also makes liable any "officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the Wage Act] . . . ."

79. Section 2 of the Wage Act also provides that the term "employer" includes any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee."

80. Illinois Department of Labor regulation 300.500 states that, under the Wage Act, "[a] claim for an earned bonus arises when an employee perform[s] the requirements for a bonus set forth in a contract or an agreement between the parties," and that:

> A former employee shall be entitled to a proportionate share of a bonus earned by length of service, regardless of any provision in the contract or agreement conditioning payment of the bonus upon employment on a particular date, when the employment relationship was terminated by mutual consent of the parties or by an act of the employer through no fault of the former employee.

81. Thus, the Wage Act prohibits employers from withholding earned bonuses from an employee based solely on the employee's failure to remain employed when terminated by the employer without cause.

82. Section 14 of the Wage Act allows an employee to recover from his employer damages of 2% on all unlawfully withheld compensation for every month of withholding.

83. The Wage Act also allows for the recovery of an employee's costs and attorneys' fees in remedying violations of the Act.

84. Jim has incurred substantial legal expenses as a result of AAR's actions as detailed in this complaint.

85. Jim's RSAs and stock options constitute bonuses under the Wage Act as they were compensation in excess of Jim's regular annual salary.

86.     Jim has over $890,000 dollars in earned RSAs and 48,479 stock options that AAR has forfeited and refused to release to Jim due to AAR's termination of Jim's employment without cause.

87.     Additionally, Jim's severance payments that AAR owes but has not paid constitute compensation under the Wage Act.

88.     Mr. Romenesko and Mr. Storch, the two individual defendants, were at all relevant times aware that (i) AAR terminated Jim without cause, (ii) AAR forfeited Jim's RSAs and stock options for its own benefit, and (iii) AAR refused to pay Jim's severance payments.

89.     At all relevant times, each of the individual defendants was in a management position within AAR that allowed him to (i) prohibit AAR's forfeiture of Jim's fully earned RSAs and (ii) cause AAR to pay Jim his severance payments, but did not take either such action.

90.     Under Illinois law, the defendants cannot refuse to pay Jim his RSAs when AAR's termination of Jim without cause is what prevented Jim from remaining employed long enough to obtain that compensation.

91.     AAR also has no basis to deny Jim his severance payments or to forfeit his stock options.

WHEREFORE, Plaintiff James J. Clark prays that the Court enter a judgment in his favor against all defendants (i) holding that the defendants violated the Illinois Wage Payment and Collection Act by wrongfully withholding Jim's compensation; (ii) awarding Jim his severance payments; (iii) awarding Jim his stock options and unreleased RSAs, including unpaid dividends; (iv) awarding Jim all reasonable costs and attorneys' fees; (v) awarding Jim damages of 2% on all unlawfully withheld compensation for every month of withholding; (vi) awarding Jim

prejudgment and post judgment interest, and (vii) awarding Jim all other remedies available under the Wage Act that this Court deems appropriate.

**Count II – Breach of Contract**
**(Against AAR)**

92.     Jim re-alleges and incorporates by reference paragraphs 1-91 above as if fully stated herein.

93.     Each of the RSA Agreements between Jim and AAR are enforceable contracts except as and to the extent provided otherwise by Illinois law.

94.     Jim performed all of his obligations under each RSA Agreement by, *inter alia*, performing his job to the levels required to meet the targeted financial goals.

95.     Pursuant to the terms of the RSA Agreements, AAR was required to release Jim's earned RSAs on specified distribution dates.

96.     Under the RSA Agreements, a condition precedent to AAR's release of Jim's benefits was that, absent Jim's Death, Disability or retirement, Jim remained employed on the distribution dates.

97.     AAR made fulfillment of this condition precedent impossible by firing Jim without cause prior to the relevant distribution dates.

98.     These various forfeiture provisions were not intended to allow AAR to terminate Jim's employment without cause before the relevant distribution dates in order to forfeit Jim's fully earned RSAs and/or stock options for AAR's benefit.

99.     AAR invoked the provisions in bad faith by terminating Jim without cause and then treating Jim's unvested RSAs and unexercised stock options as forfeited to it.

100.     AAR breached its RSA Agreements with Jim by unequivocally refusing to ever distribute Jim's RSAs to him or allowing Jim to exercise his stock options after AAR terminated Jim without cause.

WHEREFORE, Plaintiff James J. Clark prays that the Court enter a judgment in his favor against AAR (i) holding that AAR breached the RSA Agreement with Jim; (ii) awarding Jim his unexercised stock options and unreleased RSAs; (iii) awarding Jim prejudgment and post judgment interest, and (iv) awarding Jim all other remedies available that this Court deems appropriate.

## Count III – Breach of Contract
### (Against AAR)

101.     Jim re-alleges and incorporates by reference paragraphs 1-100 above as if fully stated herein.

102.     The Severance Agreement between Jim and AAR is an enforceable contract except as and to the extent provided otherwise by Illinois law.

103.     Under the Severance Agreement, Jim was entitled to certain severance payments if he was terminated by AAR without cause, including a year's salary and a bonus if bonuses were given during the year of Jim's termination.

104.     Jim performed all of his obligations under the Severance Agreement.

105.     AAR has not paid Jim any of the payments provided for by the Severance Agreement.

106.     AAR breached the Severance Agreement by failing to pay Jim his severance payments upon Jim's termination without cause.

WHEREFORE, Plaintiff James J. Clark prays that the Court enter a judgment in his favor against AAR (i) holding that AAR breached the Severance Agreement with Jim; (ii) awarding

Jim his unpaid severance payments; (iii) awarding Jim prejudgment and post judgment interest and (iv) awarding Jim all other remedies available that this Court deems appropriate.

### Count IV – Age Discrimination in Employment Act
### (Against AAR)

107.    Jim re-alleges and incorporates by reference paragraphs 1-106 above as if fully stated herein.

108.    The Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., makes it illegal for certain employers to discriminate against employees based on age.

109.    AAR is an employer under Section 630(b) of the ADEA.

110.    AAR violated the ADEA by taking the following actions against Jim because of his age: (1) terminating him in June of 2011; (2) refusing to pay Jim severance provided for under the Severance Agreement and requesting that Jim waive his age discrimination, and other claims before receiving said severance; and (3) forfeiting other compensation and/or benefits due Jim, including his RSAs and SKERP benefits.

111.    AAR's actions constituted willful age discrimination in breach of the ADEA.

112.    AAR's discrimination caused Jim's termination, the loss of his severance benefits, the forfeiture of his RSAs, stock options and SKERP benefits, lost earnings and benefits, reputational harm, emotional pain and suffering and other injuries.

WHEREFORE, Plaintiff James J. Clark prays that the Court enter a judgment in his favor against AAR Corp. (i) holding that AAR violated the Age Discrimination in Employment Act by willfully discriminating Jim due to his age; (ii) reinstating Jim to a position that he would hold absent AAR's discriminatory conduct, or in the alternative, front pay, (iii) awarding Jim lost back pay, lost wages, lost future earnings, lost severance benefits, lost RSAs, lost stock options and lost SKERP benefits; (iv) awarding all other lost benefits that Jim has been denied due to his

unlawful termination from AAR, (v) awarding Jim liquidated damages due to AAR's willful violation of the ADEA (vi) awarding Jim costs and attorneys' and other professional fees; (vii) awarding Jim prejudgment and post judgment interest, and (viii) granting any other remedies this Court deems appropriate.

## Count V – Retaliation under the Age Discrimination in Employment Act
### (Against AAR)

113.   Jim re-alleges and incorporates by reference paragraphs 1-112 above as if fully stated herein.

114.   Section 623(d) of the ADEA makes it unlawful for an employer to discriminate against any employee because such employee opposed any practice made illegal by the ADEA.

115.   On or about May 13, 2010, citing AAR's desire to move Jim out of the way in order to make room for younger people like John Holmes, age approximately 33, who will be with the company for the next 20 years so that AAR could focus on developing them, AAR's President & COO defendant Timothy Romenesko informed Jim that AAR was reducing Jim's compensation, position and responsibilities and assigning certain of Jim's responsibilities to John Holmes.

116.   Shortly after his conversation with Mr. Romenesko, Jim met with AAR's Vice President of Human Resources, Timothy Skelly, to voice his opposition to AAR's age-based demotion of Jim.   During that meeting, Mr. Skelly admitted to Jim that Mr. Romenesko's comments were clearly a basis for an age discrimination claim.

117.   AAR violated the ADEA by taking the following actions against Jim because of his opposition to age discrimination: (1) terminating Jim in June of 2011; (2) refusing to pay Jim severance provided for under the Severance Agreement and requesting that Jim waive his

19

retaliation and other claims before receiving said severance; and (3) forfeiting other compensation and/or benefits due Jim, including his RSAs, stock options and SKERP benefits.

118.    AAR's actions constituted willful retaliation in breach of the ADEA.

119.    AAR's retaliation caused Jim's termination, the loss of his severance benefits, the forfeiture of his RSAs, stock options and SKERP benefits, lost earning and benefits, reputational harm, emotional pain and suffering and other injuries.

WHEREFORE, Plaintiff James J. Clark prays that the Court enter a judgment in his favor against AAR Corp. (i) holding that AAR violated the Age Discrimination in Employment Act by willfully retaliating against Jim due to his opposition to age discrimination; (ii) reinstating Jim to a position that he would hold absent AAR's discriminatory conduct, or in the alternative, front pay, (iii) awarding Jim lost back pay, lost wages, lost future earnings, lost severance benefits, lost RSAs, lost stock options and lost SKERP benefits; (iv) awarding all other lost benefits that Jim has been denied due to his unlawful termination from AAR, (v) awarding Jim liquidated damages due to AAR's willful violation of the ADEA (vi) awarding Jim costs and attorneys' and other professional fees; (vii) awarding Jim prejudgment and post judgment interest, and (viii) granting any other remedies this Court deems appropriate.

**JAMES J. CLARK**

By  /s/ Michael E. Fox
    One of His Attorneys

Michael E. Fox (#0857343)
Adam A. Hachikian (#6283021)
Brian J. Wilson (#6294099)
**FOX, HEFTER, SWIBEL, LEVIN & CARROLL, LLP**
200 W. Madison Street, Suite 3000
Chicago, Illinois 60606-3414
PH (312) 224-1200
FX (312) 224-1202

Robert Cohen (#6193698)
**FRANKEL & COHEN**
53 W. Jackson Blvd., Ste.1615
Chicago, IL 60604
PH (312) 759-9600
FX (312) 697-0812

DATED:  February 14, 2012

# EXHIBIT A

**COMPOSITE\* OF**
**AMENDED AND RESTATED**
**AAR CORP.**
**STOCK BENEFIT PLAN**
**(Effective October 1, 2001)**

1.    *Purpose and Eligibility*

AAR CORP. adopted the AAR CORP. Stock Benefit Plan (formerly named the AAR CORP. 1983 Incentive Stock Plan), effective April 12, 1983, as amended and restated effective July 22, 1986 and as subsequently further amended from time to time (the "Plan"). AAR CORP. now further amends and restates the Plan, effective October 1, 2001. This Plan is adopted to encourage officers and other key employees of the Company who have executive, managerial, supervisory or professional responsibilities and non-employee members of the Board to increase their investment in the Company and to provide additional opportunities to such persons to share in the success of the Company. The opportunity so provided is intended to foster in Grantees a strong incentive to put forth maximum effort for the continued success and growth of the Company, to aid in retaining individuals who put forth such efforts, and to assist in attracting the best available individuals in the future.

Non-Employee Directors shall participate in the Plan through discretionary grants of NSOs pursuant to Section 5 hereof and Restricted Stock Awards pursuant to Section 9 hereof. Key Employees and Non-Employee Directors who have been selected by the Committee to receive an Award shall participate in the Plan. The Committee shall determine, within the limits of the express provisions of the Plan, those Key Employees and Non-Employee Directors to whom, and the time or times at which, Awards shall be granted. In making a determination concerning the granting of Awards, the Committee may take into account the nature of services the Key Employees or Non-Employee Director has rendered, or that the Committee expects he will render, his present and potential contributions to the success of the business, the number of years of effective service he is expected to have, and such other factors as the Committee in its sole discretion shall deem relevant. The Committee shall also determine, with respect to Awards to Key Employees and Non-Employee Directors, the number of Shares to be subject to each Award, with respect to Key Employees the type of Awards (Restricted Stock, Options or Stock Appreciation Rights (SARs)); with respect to Non-Employee Directors the type of Awards (Restricted Stock or Options); the type of Options for Key Employees (ISO or NSO); the duration of each Option; the exercise price under each Option, the time or times within which (during the Term of the Option) all or portions of each Option may be exercised, whether cash, Shares, Options or other property may be accepted in full or partial payment upon exercise of an Option; the restrictions to be imposed on Shares of Restricted Stock and any other terms and conditions of such Awards.

2.    *Definitions*

For purposes of this Plan, the following terms shall have the meaning set forth below:

\*including Amendment No. 1 effective 6/26/03, Amendment No. 2 effective 4/11/05, Amendment No. 3 effective 7/12/05, Amendment No. 4 effective 6/1/06, Amendment No. 5 effective 1/23/07, Amendment No. 6 effective 1/27/07.

2.1    "Award" shall mean an Option, a Restricted Stock Award or an SAR Award.

2.2    "Board" means the Board of Directors of the Company.

2.3    "Cause", when used in regard to the termination of a Key Employee's employment with the Company, shall mean termination of such employment by the Company (a) because of the Key Employee's dishonesty, fraud or breach of trust, gross negligence or substantial misconduct in the performance of, or substantial nonperformance of, his or her assigned duties or willful violation of Company policy, (b) because of any act or omission by the Key Employee that is a substantial cause for a regulatory body with jurisdiction over the Company to request or recommend the suspension or removal of the Key Employee or to impose sanctions upon the Company or the Key Employee, (c) because of a material breach by the Key Employee of any applicable employment agreement between him and the Company or (d) as defined in the applicable Option Agreement, Restricted Stock Agreement or Stock Appreciation Right Agreement issued hereunder. Whether the termination of a Key Employee's employment is for Cause shall be determined by the management of the Company in its sole discretion.

2.4    "Change in Control" means the earliest of:

(a)    any person (as such term is used in Section 13(d) of the Securities Act of 1934, as amended ("Exchange Act")), has acquired (other than directly from the Company) beneficial ownership (as that term is defined in Rule 13d-3 under the Exchange Act), of more than 20% of the outstanding capital stock of the Company entitled to vote for the election of directors;

(b)    the effective time of (i) a merger or consolidation or other business combination of the Company with one or more other corporations as a result of which the holders of the outstanding voting stock of the Company immediately prior to such business combination hold less than 60% of the voting stock of the surviving or resulting corporation, or (ii) a transfer of substantially all of the assets of the Company other than to an entity of which the Company owns at least 80% of the voting stock; or

(c)    the election, over any period of time, to the Board of Directors of the Company without the recommendation or approval of the incumbent Board of Directors of the Company, of the lesser of (i) three directors, or (ii) directors constituting a majority of the number of directors of the Company then in office.

2.5    "Code" means the Internal Revenue Code of 1986, as amended, as in effect at the time of reference, or any successor revenue code which may hereafter be adopted in lieu thereof, and references to any specific provisions of the Code shall refer to the corresponding provisions of the Code as it may hereafter be amended or replaced.

2.6    "Committee" means the Board's Compensation Committee, or such other committee of not less than two directors who are "non-employee directors" within the meaning of Rule 16b-3 under the Securities Exchange Act of 1934 and "outside

directors" within the meaning of Section 162(m) of the Code and the regulations thereunder, as shall be designated by the Board.

2.7    "Company" means AAR CORP., a Delaware corporation, and its subsidiaries, which include any businesses, whether or not incorporated, in which the Company owns directly or indirectly not less than 50 percent of the equity interest at the time an Award is granted to an employee thereof, or in any other case, at the time of reference.

2.8    "Continuing Director" shall mean a member of the Board of the Company prior to the occurrence of a Change in Control.

2.9    "Disability" means the inability of an individual to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

2.10    "Fair Market Value" means, with respect to the Company's Shares, the closing price of the Shares on the trading day corresponding to, or if no trading occurred on the New York Stock Exchange on such date, the trading day immediately preceding, the date on which the value is to be determined, as reported on the NYSE-Composite Tape or such other source of quotations for or reports of trading activity in Shares as the Committee may from time to time select. If no trades in Shares occurred on the relevant trading day, the mean between the bid and asked prices of a Share as reflected on the NYSE-Composite Tape at the close of the market on such trading day shall be deemed to be the Fair Market Value.

2.11    "Grantee" means a person to whom an Award is granted.

2.12    "Incentive Stock Option" or "ISO" means an Option meeting the conditions and containing the limitations and restrictions set forth in Section 422 of the Code.

2.13    "Key Employee" means an officer or other key employee of the Company who has executive, managerial, supervisory or professional responsibilities.

2.14    "Non-Employee Directors" means non-employee members of the Board.

2.15    "Non-Qualified Stock Option" or "NSO" means an Option other than an Incentive Stock Option.

2.16    "Option" means the right to purchase, at a price and for a term fixed by the Committee in accordance with the Plan, and subject to such other limitations and restrictions as the Plan and the Committee impose, the number of Shares specified by the Committee.

2.17    "Option Agreement" means a written agreement issued in connection with the grant of an Option, as specified in subsection 5.2.

2.18    "Plan" means the Company's Stock Benefit Plan as reflected in the provisions contained herein, and as it may be amended from time to time.

2.19    "Restricted Stock Agreement" means a written agreement issued in connection with the grant of a Restricted Stock Award, as specified in subsection 9.3.

2.20    "Restricted Stock Award" means the grant, at a time or times fixed by the Committee in accordance with the Plan, and subject to such other limitations and restrictions as the Plan and the Committee may impose, of the number of Shares specified by the Committee. The term "Restricted Stock" shall refer to Shares issued pursuant to a Restricted Stock Award.

2.21    "Retirement" means the voluntary termination of employment by a Key Employee, or a termination of employment by the Company without cause of a Key Employee who, at the date of such termination of employment, has attained the calendar year age of sixty-five (65) and whose calendar year age plus years of Credited Service under the AAR CORP. Retirement Plan equals seventy-five (75).  Notwithstanding the preceding sentence, (i) with respect to a grant or an Award made on or before March 31, 2006, "Retirement" shall include the voluntary termination of employment of a Key Employee who, at the date of such termination, has attained the calendar year age of fifty-five (55) and whose calendar year age plus years of Credited Service under the AAR CORP. Retirement Plan equals at least sixty-two (62), and (ii) with respect to a grant or an Award made after March 31, 2006 and prior to April 18, 2007, "Retirement" shall include the voluntary termination by a Key Employee, or a termination by the Company without cause of a Key Employee who, at the date of such termination of employment, is at least (a) calendar year age sixty-five (65) or (b) calendar year age fifty-five (55) and whose calendar year age plus years of Credited Service with the Company is at least equal to seventy-five (75).

In the case of a Non-Employee Director, "Retirement" means the voluntary termination of membership on the Board at or after having attained the calendar year age of sixty-five (65) and whose calendar year age plus consecutive years of service as a director of the Company equals sixty-five (65).

2.22    "Shares" means the shares of the Company's $1.00 par value common stock or, if by reason of the adjustment provisions hereof, any rights under an Award pertain to any other security, such other security.

2.23    "Stock Appreciation Right Agreement" means a written agreement issued in connection with the grant of a Stock Appreciation Right Award, as specified in Section 10.

2.24    "Stock Appreciation Right Award" means the grant of an SAR at a time or times fixed by the Committee in accordance with the Plan, and subject to such other limitations and restrictions as the Plan and the Committee may impose, of the number of SARs specified by the Committee.  The term "Stock Appreciation Right" or "SAR" shall refer to rights issued pursuant to a Stock Appreciation Right Award.

-4-

2.25 "Successor" means the legal representative of the estate of a deceased Grantee or the person or persons who shall acquire Restricted Stock, or the right to exercise an Option or an SAR, by bequest or inheritance or by reason of the death of the Grantee.

2.26 "Taxable Date" means the date a Grantee recognizes income with respect to an Award under the Code or any applicable state income tax code.

2.27 "Term" means the period during which a particular Option or SAR may be exercised or the period during which the restrictions placed on a Restricted Stock Award are in effect.

3. *Administration*

3.1 The Plan shall be administered by the Committee.

3.2 The Committee shall have plenary authority with respect to Key Employees, subject to the provisions of the Plan, to determine when and to whom Awards shall be granted, the Term of each Award, the number of Shares covered by it, the effect of participation by a Grantee in other plans, and any other terms or conditions of each such Award. The number of Shares, the Term and other terms and conditions of a particular kind of Award need not be the same even as to Awards made at the same time. The Committee's actions in making Awards and fixing their size, Term, and other terms and conditions shall be conclusive on all persons.

3.3 The Committee shall have the sole responsibility for construing and interpreting the Plan, for establishing and amending such rules and regulations as it deems necessary or desirable for the proper administration of the Plan, and for resolving all questions arising under the Plan. Any decision or action taken by the Committee arising out of or in connection with the construction, administration, interpretation and effect of the Plan and of its rules and regulations shall, to the extent permitted by law, be within its absolute discretion, except as otherwise specifically provided herein, and shall be conclusive and binding upon all Grantees, all Successors, and any other person, whether that person is claiming under or through any Grantee or otherwise.

3.4 The Board shall designate one of the members of the Committee as the Chairman of the Committee. The Committee shall hold its meetings at such times and places as it may determine. A majority of its members shall constitute a quorum, and all determinations of the Committee shall be made by a majority of its members. Any determination reduced to writing and signed by all members shall be fully as effective as if it had been made by a majority vote at a meeting duly called and held. The Committee may appoint a Secretary, who need not be a member of the Committee, and may make such rules and regulations for the conduct of its business as it shall deem advisable.

3.5 No member of the Committee shall be liable, in the absence of bad faith, for any act or omission with respect to his or her service on the Committee. Service on the Committee shall constitute service as a director of the Company, so that the members of the Committee shall be entitled to indemnification and reimbursement as directors of the Company pursuant to its By-Laws.

4. *Shares Subject to the Plan*

4.1 The total number of Shares that may be available for Awards under the Plan, including without limitation the total number of Shares that may be subject to ISOs under the Plan, from and after April 11, 2005, shall be 3,532,226 Shares, adjusted in accordance with the provisions of Section 4.2 hereof. A Share subject to an Option and its related tandem Restricted Stock Award shall only be counted once. The Shares so issued may be Shares held in the treasury or Shares which are authorized but unissued as elected by the Board. Any Shares subject to issuance upon exercise of Options but which are not issued because of a surrender, lapse, expiration, cancellation or termination of any such Option, or which have been issued in connection with Restricted Stock Awards that are subsequently cancelled or forfeited, to the extent consistent with applicable law, rules and regulations, shall once again be available, to the extent set forth by the Committee in a written resolution, for issuance in satisfaction of Awards.

4.2 Any increase or decrease in the number of outstanding Shares of the Company occurring through stock splits, stock dividends, stock consolidations, spin-offs, other distributions of assets to shareholders, or assumptions or conversions of outstanding Awards due to an acquisition after the adoption of the Plan shall be reflected proportionately in an increase or decrease in the aggregate number of Shares then available for the grant of Awards under the Plan or becoming available through the termination, surrender or lapse of Awards previously granted but unexercised, and in the number of Shares subject to Awards then outstanding; and a proportionate reduction or increase shall be made in the per Share option price or exercise price to any outstanding Options or SARs. Any fractional Shares resulting from such adjustments shall be eliminated. If changes in capitalization other than those considered above shall occur, the Board shall make such adjustment in the number or class of Shares as to which Awards may thereafter be granted, in the number and class of Shares remaining subject to Awards then outstanding and in the per Share option price or exercise price as the Board in its discretion may consider appropriate, and all such adjustments shall be conclusive upon all persons.

4.3 The total number of Shares with respect to which Options and SARs may be granted under the Plan to any Grantee during any calendar year shall not exceed the number of Shares available for issue under the Plan at the time of the grant.

5. *Grants of Options*

5.1 Subject to the terms of the Plan, the Committee may from time to time grant Options, which may be Non-Qualified Stock Options, or Incentive Stock Options if granted to Key Employees, and must be Non-Qualified Stock Options if granted to Non-Employee Directors. Unless otherwise expressly provided at the time of the grant, Options granted to Key Employees under the Plan will not be ISOs. Notwithstanding the foregoing, outstanding NSOs granted to Key Employees may be converted to ISOs at the discretion of the Committee in accordance with, and to the extent, allowed by law.

5.2 Each Option shall be evidenced by a written Option Agreement specifying the type of Option granted, the Option exercise price, the terms for payment of the exercise price, the duration of the Option, the number of Shares to which the Option

-6-

pertains and, in the case of grants to Key Employees, the terms of any related Stock Appreciation Right Award or Restricted Stock Award. An Option Agreement may, in the sole discretion of the Committee, also contain a vesting schedule, a non-competition agreement, a confidentiality provision, provisions for forfeiture and such restrictions, conditions and other terms as the Committee shall determine in its sole discretion. Option Agreements need not be identical.

5.3     Each Option shall expire and all rights to purchase Shares thereunder shall cease on the date fixed by the Committee in the Option Agreement, which shall not be later than the tenth anniversary of the date on which the Option was granted, except as otherwise required under Section 6.4 hereof.   Further, if provided in the Option Agreement, any Option granted pursuant to the Plan shall expire and all rights to purchase Shares thereunder shall cease, if (a) the Non-Employee Director or the Key Employee violates a non-competition or confidentiality agreement, any Company policy, or any other conditions set forth in the Option Agreement or in a separate document, or (b) the Key Employee violates an employment agreement, (c) the Non-Employee Director's service on the Board terminates as provided in Section 12, or (d) the Key Employee's employment terminates as provided in Section 12.

5.4     Each Option shall become exercisable at the time, and for the number of Shares, fixed by the Committee in the Option Agreement.  Except to the extent otherwise provided in or pursuant to Section 13, or in the proviso to this sentence, no Option shall become exercisable as to any Shares prior to the first anniversary of the date on which the Option was granted; provided that (a) the Committee may provide, at the time of grant or subsequently that an Option granted to a person who is or becomes subject to taxation under any applicable law that would tax such person upon the grant of such Option, shall be exercisable from and after the date of grant or (b) the Committee, in its discretion, shall have the power at any time to accelerate the dates for exercise of any or all Options, or any part thereof, granted to a Non-Employee Director or a Key Employee under the Plan.

6.     *Required Terms and Conditions of Incentive Stock Options*

6.1     Except as provided in subsection 6.4, the per Share exercise price of each ISO shall be at least 100 percent of the Fair Market Value of the Shares at the time such ISO is granted.

6.2     The aggregate Fair Market Value (determined with respect to each Incentive Stock Option at the time such Option is granted) of the Shares with respect to which Incentive Stock Options are exercisable for the first time by an individual during any calendar year (under all incentive stock option plans of the Company and its parent and subsidiary corporations) shall not exceed $100,000.  If the aggregate Fair Market Value (determined at the time of grant) of the Shares subject to an Option, which first becomes exercisable in any calendar year exceeds the limitation of this subsection, so much of the Option that does not exceed the applicable dollar limit shall be an ISO and the remainder shall be an NSO; but in all other respects, the original Option Agreement shall remain in full force and effect.

6.3    As used in this Section 6, the words "parent" and "subsidiary" shall have the meanings given to them in Section 424(e) and 424(f) of the Code.

6.4    Notwithstanding anything herein to the contrary, if an Incentive Stock Option is granted to an individual who owns stock possessing more than 10 percent of the total combined voting power of all classes of stock of the Company or of its parent or subsidiary corporation, within the meaning of Section 422(b)(6) of the Code, (i) the purchase price of each Share subject to Option shall be not less than 110 percent of the Fair Market Value of the Share on the date the Option is granted, and (ii) the Option shall expire and all rights to purchase Shares thereunder shall cease no later than the fifth anniversary of the date the Option was granted.

6.5    No ISOs may be granted under the Plan after July 15, 2002.

7.    *Required Terms and Conditions of Non-Qualified Stock Options*

Each NSO granted to a Grantee shall be in such form and subject to such restrictions and conditions and other terms as the Committee may determine at the time of grant, subject to the general provisions of the Plan, the applicable Option Agreement, and the following specific rules:

7.1    The number of Shares subject to each NSO and the per Share exercise price of each NSO shall be 100 percent of the Fair Market Value of the Shares on the date the NSO is granted.  In no event may the exercise price be less than the par value of the Shares subject to such NSO.

7.2    The Committee shall specify at the time each NSO is granted, the duration of each NSO and the time or times within which (during the term of the NSO) all or portions of each NSO may be exercised, except to the extent that other terms of exercise are specifically provided by other provisions of the Plan, and such provisions shall be specified in the applicable Option Agreement.

8.    *Intentionally left blank.*

9.    *Restricted Stock Awards to Key Employees and Non-Employee Directors*

9.1    Subject to the terms of the Plan, the Committee may also grant to Key Employees and Non-Employee Directors Restricted Stock Awards from time to time. Restricted Stock may be granted to a Key Employee or a Non-Employee Director either separately from, or in tandem with, the grant of an Option to the Key Employee or Non-Employee Director.  In the case of Restricted Stock granted in tandem with the grant of an Option (a) the exercise of the Option shall cause the forfeiture to the Company of the Restricted Stock related to the Option or portion thereof that is exercised; and (b) the lapse of restrictions applicable to such Restricted Stock shall cause the expiration of the unexercised Option, or portion thereof, related to such Restricted Stock. Restricted Stock not granted in tandem with the grant of an Option shall have no effect on, and shall not be affected by, the exercise of any Option by the holder of such Restricted Stock.

9.2    The terms and conditions of any such Award, including restrictions on transfer or on the ability of the Grantee to make elections with respect to the taxation of the Award without the consent of the Committee, shall be determined by the Committee at the time of grant. Except as provided in Sections 10.1, 10.6, 13, 14 and 15, no such restrictions shall lapse earlier than the first, or later than the tenth, anniversary of the date of the Award.

9.3    Restricted Stock Awards issued under the Plan shall be evidenced by written Restricted Stock Agreements which shall specify whether such Restricted Stock is issued separate from, or in tandem with, the grant of an Option, the number of Shares issuable under the Restricted Stock Award evidenced thereby, and such other provisions as the Committee, in its sole discretion, may determine.

9.4    The number of Shares granted under a Restricted Stock Award shall be issued to the Grantee thereof on the date of grant of such Award or as soon as may be practicable thereafter. Shares issued pursuant to Restricted Stock Awards shall be duly issued or transferred, and a certificate or certificates for such Shares shall be issued in the Grantee's name. Subject to the restrictions set forth in the related Restricted Stock Agreement, the Grantee shall thereupon be a stockholder with respect to all the Shares represented by such certificate or certificates and shall have all the rights of a stockholder with respect to such Shares, including the right to vote such Shares and to receive dividends and other distributions paid with respect to such Shares. In aid of such restrictions, certificates for Shares awarded hereunder, together with a suitably executed stock power signed by each Grantee, shall be held by a nominee of the Company for the account of such Grantee until the restrictions under the related Restricted Stock Agreement lapse pursuant to such Agreement or such Shares are theretofore forfeited to the nominee of the Company as provided by the Plan or the Agreement.

9.5    At the Committee's option, the Restricted Stock Agreement may provide that any Shares of Restricted Stock granted to a Key Employee or Non-Employee Director pursuant to the Plan shall be forfeited to the Company if, among other reasons, (a) the Key Employee or Non-Employee Director violates a non-competition, confidentiality or employment agreement, any Company policy, or any other conditions set forth in the Restricted Stock Agreement or in a separate document, (b) the Key Employee's employment with the Company, or the Non-Employee Director's service on the Board, terminates prior to the date or dates for expiration of the forfeiture provisions set forth in the applicable Restricted Stock Agreement, which date shall not be earlier than the first anniversary of such grant, (c) the Key Employee's employment with the Company terminates for Cause, or (d) there occurs a violation of any provisions of the applicable Restricted Stock Agreement. A forfeiture of Restricted Stock pursuant to this subsection 9.5 shall occur immediately following the mailing of written notice to the Key Employee or Non-Employee Director. Thereafter, the Secretary of the Company shall promptly cancel shares of Restricted Stock that are forfeited to the Company.

9.6    Notwithstanding the foregoing, (a) if the Key Employee's employment terminates or the Non-Employee Director's service on the Board terminates, or (b) upon a Change in Control, any restrictions of this Section 9 or in any Restricted Stock Agreement shall lapse as provided in Sections 12 and 13.

-9-

9.7    The Committee may proscribe such other restrictions and conditions and other terms applicable to the Shares of Restricted Stock issued to a Key Employee or Non-Employee Director under the Plan that are neither inconsistent with nor prohibited by the Plan or any Restricted Stock Agreement, including, without limitation, terms providing for a lapse of the restrictions of this Section 9, provided they are set forth in the applicable Restricted Stock Agreement, in installments. Further, the Committee, in its discretion, shall have the power at any time to accelerate the dates the restrictions lapse on any or all of the Restricted Stock granted to a Key Employee or Non-Employee Director.

10.    *Stock Appreciation Rights to Key Employees*

Subject to the terms of the Plan, the Committee may also grant to Key Employees SARs from time to time. Each SAR shall be evidenced by a written Stock Appreciation Right Agreement. The Stock Appreciation Right Agreement may, in the sole discretion of the Committee, include a vesting schedule, a non-competition agreement, a confidentiality provision, provisions for forfeitures and such restrictions, conditions and other terms as the Committee shall determine in its sole discretion. Stock Appreciation Right Agreements need not be identical. Each SAR is also subject to the following specific rules:

10.1    SARs may be granted either as a separate Award ("Nontandem SAR") or in tandem with a related Option ("Tandem SAR"). At the time of grant of a Nontandem SAR, the Committee shall specify the base price of Shares to be used in connection with the calculation described in subsection 10.2 (a) below. The base price of a Nontandem SAR shall not be less than 100 percent of the Fair Market Value of a Share on the date of grant. The number of Shares subject to a Tandem SAR shall not exceed one for each Share subject to the related Option. The number of Shares subject to a Nontandem SAR shall be specified in the Stock Appreciation Right Agreement. No Tandem SAR may be granted to a Key Employee in connection with an ISO in a manner that will disqualify the ISO under Section 422 of the Code unless the Key Employee consents thereto.

10.2    Upon exercise, an SAR shall entitle the Key Employee to receive from the Company the number of Shares having an aggregate Fair Market Value equal to the following:

(a)    in the case of a Nontandem SAR, the excess of the Fair Market Value of one Share as of the date on which the SAR is exercised over the base price specified in such SAR, multiplied by the number of Shares then subject to the SAR, or the portion thereof being exercised.

(b)    in the case of a Tandem SAR, the excess of the Fair Market Value of one Share as of the date on which the SAR is exercised over the exercise price per Share specified in the Option Agreement, multiplied by the number of Shares then subject to the Option, or the portion thereof as to which the SAR is being exercised.

Cash shall be delivered in lieu of any fractional Shares. The Committee, in its discretion, shall be entitled to cause the Company to elect to settle any part or all of its

-10-

obligations arising out of the exercise of an SAR by the payment of cash in lieu of all or part of the Shares it would otherwise be obligated to deliver in an amount equal to the Fair Market Value of such Shares on the date of exercise.

10.3    A Tandem SAR shall be exercisable during such time, and be subject to such restrictions and conditions and other terms, as the Committee shall specify in the applicable Option Agreement at the time such Tandem SAR is granted. Notwithstanding the preceding sentence, the Tandem SAR shall be exercisable only at such time as the Option to which it relates is exercisable and shall be subject to the restrictions and conditions and other terms applicable to such Option. Upon the exercise of a Tandem SAR, the unexercised Option, or the portion thereof to which the exercised portion of the Tandem SAR is related, shall expire.   The exercise of any Option shall cause the expiration of the Tandem SAR related to such Option, or portion thereof, that is exercised.

10.4    A Nontandem SAR shall be exercisable as follows:

(a)    A Nontandem SAR granted under the Plan shall be exercisable during such time, and be subject to such restrictions and conditions and other terms, as the Committee shall specify in the Stock Appreciation Right Agreement at the time the Nontandem SAR is granted, which restrictions and conditions and other terms need not be the same for all Key Employees. Without limiting the generality of the foregoing, the Committee may specify a minimum number of full Shares with respect to which any exercise of a Nontandem SAR must be made.

(b)    Subject to earlier termination as provided in the last sentence of this subsection (b), a Nontandem SAR granted under the Plan shall expire on the date specified by the Committee in the Stock Appreciation Right Agreement. The Committee shall specify in the Stock Appreciation Right Agreement at the time each Nontandem SAR is granted, the time during which the Nontandem SAR may be exercised prior to its expiration and other provisions relevant to the SAR. The Committee, in its discretion, shall have the power, at any time, to accelerate the dates for exercise of any or all Nontandem SARs or any part thereof, granted under the Plan. Notwithstanding the foregoing, any Nontandem SAR granted to a Key Employee under the Plan shall expire, notwithstanding any restrictions and conditions that may be contained in his or her applicable Stock Appreciation Right Agreement, following a termination of his or her employment with the Company as provided in Sections 12 and 13.

10.5    An SAR may be exercised only by the Key Employee (or by a legatee or legatees of such SAR under his or her last will, by his or her executors, personal representatives or distributees, or by an assignee or assignees pursuant to Section 12 below).

10.6    As soon as reasonably practicable after the exercise of an SAR, the Company shall (a) issue, in the name of the Key Employee, stock certificates representing the total number of full Shares to which the Key Employee is entitled

-11-

pursuant to subsection 10.2 hereof and cash in an amount equal to the Fair Market Value, as of the date of exercise, or any resulting fractional Shares, and (b) if the Committee causes the Company to elect to settle all or part of its obligations arising out of the exercise of the SAR in cash, deliver to the Key Employee an amount in cash equal to the Fair Market Value, as of the date of exercise, of the Shares it would otherwise be obligated to deliver.

11.  *Non-Transferability of Rights*

No rights under any Award shall be transferable otherwise than by will or the laws of descent and distribution, and the rights and the benefits, of any such Award, may be exercised and received, respectively, during the lifetime of the Grantee only by him or her.

Notwithstanding the provisions of the preceding paragraph, a Grantee, at any time prior to his or her death, may assign all or any portion of an Award granted to him or her (other than an ISO) to (a) his or her spouse or lineal descendant, (b) the trustee of a trust for the primary benefit of his or her spouse or lineal descendant, (c) a partnership of which his or her spouse and lineal descendants are the only partners, or (d) a tax exempt organization as described in Section 501(c)(3) of the Code. In such event, the spouse, lineal descendant, trustee, partnership or tax exempt organization will be entitled to all of the rights of the Grantee with respect to the assigned portion of such Award, and such portion of the Award will continue to be subject to all of the terms, conditions and restrictions applicable to the Award, as set forth herein, and in the related Option Agreement, Restricted Stock Agreement or Stock Appreciation Right Agreement, immediately prior to the effective date of the assignment. Any such assignment will be permitted only if (a) the Grantee does not receive any consideration therefor, and (b) the assignment is expressly approved by the Company. Any such assignment shall be evidenced by an appropriate written document executed by the Grantee, and a copy thereof shall be delivered to the Company on or prior to the effective date of the assignment. This paragraph shall apply to all Awards granted under the Plan at any time.

12.  *Death or Termination of Employment*

12.1  Except as hereinafter provided, no Option or SAR granted pursuant to the Plan may be exercised at any time unless the holder thereof is then an employee or director of the Company. Options and SARs granted under the Plan shall not be affected by any change of employment or service on the Board so long as the Grantee continues to be an employee or director of the Company.

12.2  Except as provided in Section 13, the Option or SAR of any Grantee whose employment or service on the Board is terminated for any reason, other than for death, Disability, termination of employment for Cause, or Retirement, shall terminate on the earlier of (a) three months after termination of employment or service on the Board and (b) the date that such Option or SAR expires in accordance with its terms.

12.3  In the event of the death of a Grantee during employment or service on the Board, or within three months after the termination of employment (except as described in subsection 12.5) or service on the Board, each Option and SAR granted to such Grantee shall be exercisable or payable to the extent provided therein but not later than one year after his or her death (but not beyond the stated duration of the Option or SAR).

Any such exercise or payment shall be made only: (a) by or to the Successor of the deceased Grantee; and (b) to the extent, if any, that the deceased Grantee was entitled at the date of his or her death.

12.4    In the case of the Disability of a Grantee, the Option or SAR shall terminate on the earlier of (a) one year after termination of employment or service on the Board and (b) the date that such Option or SAR expires in accordance with its terms. During such period, the Option or SAR may be exercised by a Grantee who becomes Disabled with respect to the same number of Shares, in the same manner and to the same extent if the Grantee had continued employment or service on the Board during such period.

12.5    In the case of a Key Employee, the Option or SAR shall lapse immediately upon termination of employment of the Grantee for Cause.

12.6    In the event of the Grantee's Retirement, the Option or SAR shall remain exercisable by the retired Grantee until the Award expires by its terms and may be exercised by the retired Grantee to the same extent as if he or she had continued employment or service on the Board during such period; provided, however, if the Grantee dies before the Option or SAR expires, such Award shall be exercisable only by the Successor of the deceased Grantee to the extent that the deceased Grantee was entitled at the date of his or her death.

12.7    Pursuant to subsections 9.5 and 9.6, a Restricted Stock Award shall be subject to such restrictions in the event of the death, Disability, Retirement or other termination of employment, or termination of service on the Board, of the Grantee as are set forth in the applicable Restricted Stock Agreement.

13.    *Change in Control*

13.1    In the event of a Change in Control, an Award granted to a Key Employee shall be affected as follows:

(a)    In the event of a Change in Control which does not have the prior written approval of a majority of the Continuing Directors, and notwithstanding any conditions or restrictions contained in an agreement related to any Award, any Options (not issued in tandem with a Restricted Stock Award) and SARs outstanding to a Grantee shall become immediately exercisable and any restrictions on any Restricted Stock (not issued in tandem with an Option) shall lapse on the date of such a Change in Control. If an Option is issued in tandem with a Restricted Stock Award, the outstanding Option shall become immediately exercisable, or the restrictions on the Restricted Stock shall lapse, on the date of such a Change in Control, as elected by the Grantee. Any such election shall be made by the Grantee within thirty (30) days after such Change in Control by giving notice to the Committee, or the Secretary of any successor corporation or other entity.

(b)    In the event of a Change in Control which does have the prior written approval of a majority of the Continuing Directors, the Committee in its

-13-

sole discretion may, notwithstanding any conditions or restrictions contained in an agreement related to any Award, provide that: (i) all Options or SARs, or both, will become immediately exercisable and/or all restrictions on Restricted Stock will lapse, or (ii) all Options, SARs and Restricted Stock Awards will be exchanged for options, stock appreciation rights and restricted stock awards of the acquiring or surviving corporation of equal or, except in the case of ISOs, greater value.

13.2   In the event that a Non-Employee Director's membership on the Board terminates within one year following a Change in Control which does not have the prior written approval of a majority of the Continuing Directors, any unexercised NSOs granted to a Non-Employee Director shall become fully exercisable and all restrictions applicable to a Restricted Stock Award granted to a Non-Employee Director shall lapse.

13.3   For the purposes of subsections 13.1 and 13.2, a Change in Control shall not have the prior written approval of a majority of the Continuing Directors, unless such approval occurs prior to such Change in Control.

13.4   In the event of a sale of substantially all of the assets of the Company, or a merger, consolidation or Share exchange involving the Company, all obligations of the Company under the Plan with respect to Awards granted hereunder shall be binding on the successor to the transaction.  Employment of a Key Employee with such a successor shall be considered employment of the Key Employee with the Company for purposes of the Plan.

14.   *Exercise of Awards*

14.1   A person entitled to exercise an Option or SAR may do so by delivery of a written notice to that effect specifying the number of Shares with respect to which the Option or SAR is being exercised and any other information the Committee may prescribe.  The notice shall be accompanied, in the case of an Option, by payment as described in subsection 14.2.  Shares issued upon exercise of an Option or an SAR, or in respect of a Restricted Stock Award, shall be issued only in the name of the Grantee.  All notices or requests provided for herein shall be delivered to the Secretary of the Company.

14.2   Except as otherwise provided in the Plan or in any Option Agreement, the Grantee shall pay the purchase price of the Shares upon exercise of any Option (a) in cash, (b) in cash received from a broker-dealer to whom the Grantee has submitted an exercise notice consisting of a fully endorsed Option (however, in the case of an insider subject to Section 16 of the Securities Exchange Act of 1934, this payment option shall only be available to the extent such insider complies with Regulation T issued by the Federal Reserve Board), (c) by delivering Shares having an aggregate Fair Market Value on the date of exercise equal to the Option exercise price, (d) by directing the Company to withhold such number of Shares otherwise issuable upon exercise of such Option having an aggregate Fair Market Value on the date of exercise equal to the Option exercise price, (e) in the case of a Grantee, by such other medium of payment as the Committee, in its discretion, shall authorize at the time of grant, or (f) by any combination of (a), (b), (c), (d) and (e).  In the case of an election pursuant to (a) or (b)

above, cash shall mean cash or a certified or cashier's check issued by a federally insured bank or savings and loan association, and made payable to AAR CORP. In the case of payment pursuant to (b), (c) or (d) above, the Grantee's election must be made on or prior to the date of exercise and must be irrevocable. In lieu of a separate election governing each exercise of an Award, a Grantee may file a blanket election with the Committee which shall govern all future exercises of Awards until revoked by the Grantee. The Company shall issue, in the name of the Grantee, stock certificates representing the total number of Shares issuable pursuant to the exercise of any Option or an SAR as soon as reasonably practicable after such exercise, provided that any Shares purchased by a Grantee through a broker-dealer pursuant to clause (b) above shall be delivered to such broker-dealer in accordance with 12 C.F.R. §220.3(e)(4) or other applicable provision of law.

15. *Effective Date of the Plan/Amendment of Awards*

The Plan became effective on July 16, 1992, upon its approval at a meeting of the Company's stockholders by the affirmative votes of the holders of a majority of the Company's voting securities present or represented and entitled to vote at a meeting duly held within twelve months thereafter in accordance with Delaware law and continues thereafter until terminated by the Board of Directors. The terms of any Award may be amended at any time prior to the end of their Term in accordance with the Plan. No such amendment may adversely affect the interest of the Grantee of such Award without such Grantee's written consent.

16. *Date of Award*

The date of an Award shall be the date on which the Committee's determination to grant the same is final, or such later date as shall be specified by the Committee in connection with its determination.

17. *Stockholder Status*

No person shall have any rights as a stockholder by virtue of the grant of an Award under the Plan except with respect to Shares actually issued to that person.

18. *Postponement of Exercise*

The Committee may postpone any exercise of an Option or SAR or the distribution of any portion of a Restricted Stock Award for such time as the Committee in its sole discretion may deem necessary in order to permit the Company (a) to effect, amend or maintain any necessary registration of the Plan or the Shares issuable upon the exercise of an Option or SAR or distributable in satisfaction of a Restricted Stock Award under the Securities Act of 1933, as amended, or the securities laws of any applicable jurisdiction, (b) to permit any action to be taken in order to (i) list such Shares on a stock exchange if Shares are then listed on such exchange or (ii) comply with restrictions or regulations incident to the maintenance of a public market for its Shares, including any rules or regulations of any stock exchange on which the Shares are listed, or (iii) to determine that such Shares and the Plan are exempt from such registration or that no action of the kind referred to in (b)(ii) above needs to be taken; and the Company shall not be obligated by virtue of any terms and conditions of any Award or any provision of the Plan to recognize the exercise of an Option or an SAR or to sell or issue Shares

-15-

in violation of the Securities Act of 1933 or the law of any government having jurisdiction thereof. Any such postponement shall not extend the Term of an Option or SAR or shorten the Term of any restriction attached to any Restricted Stock Award and neither the Company nor its directors or officers shall have any obligation or liability to the Grantee of an Award, to the Grantee's Successor or to any other person with respect to any Shares as to which the Option or SAR shall lapse because of such postponement or as to which issuance under a Restricted Stock Award was delayed.

19. *Termination, Suspension or Modification of Plan*

The Board may at any time terminate, suspend or modify the Plan without the authorization of stockholders to the extent allowed by law, including without limitation any rules issued by the Securities and Exchange Commission under Section 16 of the Securities Exchange Act of 1934.

No termination, suspension or modification of the Plan shall adversely affect any right acquired by any Grantee or any Successor under an Award granted before the date of such termination, suspension or modification, unless such Grantee or Successor shall consent; but it shall be conclusively presumed that any adjustment for changes in capitalization as provided for herein does not adversely affect any such right. Any member of the Board who is an officer or employee of the Company shall be without vote on any proposed amendment to the Plan, or on any other matter which might affect that member's individual interest under the Plan.

20. *Taxes*

Upon the Taxable Date of any Award, the Company shall have the right to require the Grantee to remit to the Company an amount in cash sufficient to satisfy all minimum federal, state, local and foreign withholding tax requirements prior to the delivery by the Company of cash or any certificate or certificates for Shares. Whenever payments under the Plan are to be made in cash, such payments shall be net of any amounts sufficient to satisfy all minimum federal, state, local and foreign withholding tax requirements. In connection with an Award in the form of Shares and in lieu of making a cash payment to the Company, the Grantee may elect to satisfy his or her tax withholding obligation incurred in connection with the Taxable Date of an Option, SAR or Restricted Stock Award by (a) directing the Company to withhold a portion of the Shares otherwise distributable to the Grantee, or (b) by transferring to the Company a certain number of Shares (either subject to such Restricted Stock Award or previously owned), such Shares being valued at the Fair Market Value for the Shares on such Taxable Date. Notwithstanding any provision of the Plan to the contrary, a Grantee's election pursuant to the preceding sentence (a) must be made on or prior to the date as of which income is realized by the Grantee in connection with such Option, SAR or Restricted Stock Award, and (b) must be irrevocable. In lieu of a separate election on each Taxable Date of an Award, a Grantee may file a blanket election with the Committee which shall govern all future Taxable Dates until revoked by the Grantee.

If the holder of Shares purchased in connection with the exercise of an Incentive Stock Option disposes of such Shares within two years of the date such ISO was granted or within one year of such exercise, he or she shall notify the Company of such disposition and remit an amount necessary to satisfy applicable withholding requirements including those arising under federal income tax laws. If such holder does not remit such amount, the Company may withhold

-16-

all or a portion of any salary then or in the future owed to such holder as necessary to satisfy such requirements.

21.  *Tenure*

Nothing contained in the Plan shall be construed as a contract of employment between the Company and any person, nor shall the Plan be deemed to give any person the right to be retained in the employ of the Company or as a Non-Employee Director of the Board or limit the right of the Company to employ or discharge any person with or without Cause, or to discipline any Employee.

22.  *Application of Proceeds*

The cash proceeds received by the Company from the sale of its Shares under the Plan shall be used for general corporate purposes.

23.  *Other Actions*

Nothing in the Plan shall be construed to limit the authority of the Company to exercise its corporate rights and powers, including, by way of illustration and not by way of limitation, the right to grant options for proper corporate purposes otherwise than under the Plan to any employee or any other person, firm, corporation, association or other entity, or to grant options to, or assume options of, any person in connection with the acquisition, by purchase, lease, merger, consolidation or otherwise, of all or any part of the business and assets of any person, firm, corporation, association or other entity.

24.  *Loan Agreements*

Each Award shall be subject to the condition that the Company shall not be obligated to issue or transfer its Shares or to pay an amount in cash to the Grantee thereof on its exercise, or otherwise, if the Committee or the Board determines that such issuance, transfer, or payment, would violate any covenant in any loan agreement or other contract to which the Company or a Subsidiary is a party.

25.  *Notices*

Notices given pursuant to the Plan shall be in writing and shall be deemed received when personally delivered or three days after mailed by United States registered or certified mail, return receipt requested, addressee only, postage prepaid. Notice to the Company shall be directed to:

> Corporate Secretary
> AAR CORP.
> 1100 N. Wood Dale Road
> Wood Dale, Illinois 60191

Notices to or with respect to a Grantee shall be directed to the Grantee, or the Successor of a deceased Grantee, at the Grantee's home address on the records of the Company.

26.  *AAR CORP. Stock Option Plan for Non-Employee Directors*

-17-

The AAR CORP. Stock Option Plan for Non-Employee Directors, dated August 1,1988 ("Non-Employee Directors Plan") was terminated effective July 16, 1992, and no further options thereunder shall be granted after such termination; provided, however, that such termination shall not affect any options outstanding thereunder which shall continue to be subject to the terms and conditions of the Non-Employee Directors Plan and the written agreements evidencing such options. The Committee hereunder shall have authority to interpret and administer such options and applicable agreements. Notwithstanding the preceding provisions of this Section, a Reload Option may be granted, pursuant to the terms of Section 8 above, in connection with an option granted under the Non-Employee Directors Plan.

27.   *Leaves of Absence*

The Committee shall be entitled to make such rules, regulations and determinations as it deems appropriate under the Plan regarding any leave of absence taken by a Key Employee or Non-Employee Director who is the recipient of any Award. Without limiting the generality of the foregoing, the Committee shall be entitled to determine (a) whether or not any such leave of absence shall constitute a termination of employment or service on the Board within the meaning of the Plan, and (b) the impact, if any, of any such leave of absence on Awards under the Plan theretofore made to any Key Employee or Non-Employee Director who takes such leave of absence.

28.   *Governing Law*

The Plan, and all Awards and agreements hereunder, shall be construed in accordance with and governed by the laws of the State of Illinois and, in the case of ISOs, Code Section 422 and regulations issued thereunder.

IN WITNESS WHEREOF, the Company has caused the AAR CORP. Stock Benefit Plan (as amended and restated effective October 1, 2001) to be executed on its behalf by its duly authorized officer.

**AAR CORP.**

By:_____
Its:            President

Dated:_____, 2002

-18-

# EXHIBIT B

Exhibit 10.12

2010 Form

### AAR CORP.

### Restricted Stock Agreement
("Agreement")

Subject to the provisions of the AAR CORP. Stock Benefit Plan and the Long–Term Incentive Plan for Fiscal 20    (together, the "Plan"), the terms of which are hereby incorporated by reference, and in consideration of the agreements of the Grantee herein provided, AAR CORP. a Delaware corporation ("Company"), hereby grants to Grantee a restricted stock award ("Award"), effective    , 20     ("Date of Award"), for the number of shares of common stock ("Common Stock") of the Company, $1.00 par value ("Award Shares") set forth in the Company's notification of Award grant letter to the Grantee dated    , 20    and incorporated herein by reference, subject to the forfeiture and nontransferability provisions hereof and the other terms and conditions set forth herein:

1.      Acceptance by Grantee.  The Award is conditioned upon the acceptance by the Grantee of the terms and conditions of the Award as set forth in this Agreement.  The Grantee must confirm acceptance of the Award and this Agreement on Smith Barney's web site (www.benefitaccess.com).  If the Grantee does not accept the Award and this Agreement within 30 days from the date of the notification of the Award, the Award referenced herein shall expire unless the acceptance date is extended in writing by the Company.

2.      Restrictions.  The Grantee represents that he is accepting the Award Shares without a view to the distribution of said Shares and that he will not sell, assign, transfer, pledge or otherwise encumber the Award Shares during the period commencing on the Date of Award and ending on the date restrictions applicable to such Award Shares are released pursuant to this Agreement ("Restrictive Period").

3.      Release of Restrictions.  Subject to the provisions of paragraph 4 below, the restrictions described in paragraph 2 above shall be released with respect to 50% of the Award Shares on May 31, 20    and 50% of the Award Shares on May 31, 20    , except as follows:

(a)      *In General.*  If the Grantee's employment with the Company and all subsidiaries of the Company terminates prior to the last day of the Restrictive Period for any reason other than death, Disability or Retirement, the Grantee shall forfeit to the Company all Award Shares not previously released from the restrictions of paragraph 2 hereof.

(b)      *Retirement.*  If the Grantee's employment with the Company and all subsidiaries of the Company terminates by reason of Retirement prior to the last day of the Restrictive Period, the Restrictive Period shall terminate in accordance with the restriction release schedule set forth above in the first clause of this paragraph 3 as to all Award Shares not  previously released; provided, however, that if the Grantee dies after Retirement and prior to the last day of the Restrictive Period, the Grantee's date of death will be treated as the  date on which

his employment with the Company and all subsidiaries of the Company has terminated, and the provisions of paragraph 3(c) shall apply in determining the release of restrictions as to the Award Shares not previously released. For this purpose, "Retirement" means the Grantee's voluntary termination of employment, or his termination of employment by the Company or a subsidiary without Cause (as defined in the Plan), when he has (i) attained age 65 or (ii) attained age 55 and his age plus the number of his consecutive years of service with the Company and subsidiaries is at least 75.

(c)      *Death or Disability.*

(i)      If the Grantee's employment with the Company and all subsidiaries of the Company terminates by reason of death or Disability occurring on or after the Date of Award and on or before the fourth anniversary date thereof, the Restrictive Period shall terminate as to half the total number of Award Shares. The remaining shares shall be forfeited and returned to the Company. For this purpose, "Disability" means the inability of the Grantee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

(ii)      If the Grantee's employment with the Company and all subsidiaries of the Company terminates by reason of death or Disability after the fourth anniversary of the Date of Award, the Restrictive Period shall terminate as to all Award Shares not previously released.

(d)      *Restrictive Covenant.* If at any time prior to release from restrictions hereunder, Grantee, without the Company's express written consent, directly or indirectly, alone or as a member of a partnership, group, or joint venture or as an employee, officer, director, or greater than 1% stockholder of any corporation, or in any capacity engages in any activity which is competitive with any of the businesses conducted by the Company or its affiliated companies at any time during the Grantee's term of employment, the Grantee shall forfeit to the Company all Award Shares not previously released from the restrictions of paragraph 2 hereof.

4.      Change in Control. In the event of a Change in Control of the Company, whether or not such change has the prior written approval of the Continuing Directors, the Restrictive Period shall terminate as to all Award Shares not previously released.

5.      Change in Outstanding Shares. In the event of any change in the outstanding shares of Common Stock by reason of any stock dividend or split, recapitalization, merger, consolidation, combination or exchange of shares or other similar corporate change, the Award Shares shall be treated in the same manner in any such transaction as other shares of Common Stock. Any additional shares of stock received by Grantee with respect to the Award Shares in any such transaction shall be subject to the same restrictions as are then applicable to those Award Shares for which the additional shares have been issued.

2

6.  <u>Rights of Grantee</u>.  As the holder of the Award Shares, the Grantee is entitled to all of the rights of a stockholder of AAR CORP. with respect to any of the Award Shares, when issued, including, but not limited to, the right to receive dividends declared and payable since the Date of Award.

7.  <u>Shares</u>.  In aid of the restrictions set forth in paragraph 2, the Grantee will be required to execute a stock power in favor of the Company, which will be cancelled upon release of restrictions with respect to Award Shares released.  Award Shares shall be held by the Company in electronic book entry form on the records of the Company's Transfer Agent, together with the executed stock power, for the account of the Grantee until such restrictions are released pursuant to the terms hereof, or such Award Shares are forfeited to the Company as provided by the Plan or this Agreement. The Grantee shall be entitled to the Award Shares as to which such restrictions have been released, and the Company agrees to issue such Award Shares in electronic form on the records of the Transfer Agent.  Upon request by the Grantee, the Transfer Agent will transfer such released Award Shares in electronic form to the Grantee's broker for the Grantee's account or issue certificates in the name of the Grantee representing the Award Shares for which restrictions have been released.

8.  <u>Legend</u>.  The Company may, in its discretion, place a legend or legends on any electronic shares or certificates representing Award Shares issued to the Grantee that the Company believes is required to comply with any law or regulation.

9.  <u>Committee Powers</u>.  The Committee may subject the Award Shares to such conditions, limitations or restrictions as the Committee determines to be necessary or desirable to comply with any law or regulation or with the requirements of any securities exchange.  At any time during the Restrictive Period, the Committee may reduce or terminate the Restrictive Period otherwise applicable to all or any portion of the Award Shares.

10.  <u>Withholding Taxes</u>.  The Grantee shall pay to the Company an amount sufficient to satisfy all minimum tax withholding requirements, including those arising under federal, state and local income tax laws, prior to the delivery of any Award Shares.  Payment of the minimum withholding requirement may be made by one or more of the following methods:  (i) in cash, (ii) in cash received from a broker-dealer to whom the Grantee has submitted irrevocable instructions to deliver the amount of withholding tax to the Company from the proceeds of the sale of shares of Common Stock subject to the Award, (iii) by delivery to the Company of other Common Stock owned by the Grantee that is acceptable to the Company, valued at its fair market value on the date of payment, (iv) by certifying to ownership by attestation of such previously owned Common Stock, or (v) by having shares of Common Stock withheld from the Award Shares otherwise distributable to the Grantee.  Payment shall be made pursuant to the on-line procedures set forth on the AAR Stock Benefit Plan online web site through Smith Barney (www.benefitacess.com).

11.  <u>Postponement of Distribution</u>.  Notwithstanding anything herein to the contrary, the distribution of any portion of the Award Shares shall be subject to action by the Board taken

3

at any time in its sole discretion (i) to effect, amend or maintain any necessary registration of the Plan or the Award Shares distributable in satisfaction of this Award under the Securities Act of 1933, as amended, or the securities laws of any applicable jurisdiction, (ii) to permit any action to be taken in order to (a) list such Award Shares on a stock exchange if the Common Stock is then listed on such exchange or (b) comply with restrictions or regulations incident to the maintenance of a public market for its Shares of Common Stock, including any rules or regulations of any stock exchange on which the Award Shares are listed, or (iii) to determine that such Award Shares and the Plan are exempt from such registration or that no action of the kind referred to in (ii)(b) above needs to be taken; and the Company shall not be obligated by virtue of any terms and conditions of this Award or any provision of this Agreement or the Plan to issue or release the Award Shares in violation of the Securities Act of 1933 or the law of any government having jurisdiction thereof. Any such postponement shall not shorten the term of any restriction attached to the Award Shares and neither the Company nor its directors or officers shall have any obligation or liability to the Grantee or to any other person as to which issuance under the Award Shares was delayed.

      12.   <u>Miscellaneous</u>.

          (a)     This Award and this Agreement shall be construed, administered and governed in all respects under and by the laws of the State of Illinois.

          (b)     Capitalized terms used herein and not defined herein will have the meanings set forth in the Plan.

          (c)     Nothing in the Award shall confer on the Grantee any right to be or to continue in the employ of the Company or any of its subsidiaries or shall interfere in any way with the right of the Company or any of its subsidiaries to terminate the employment of the Grantee at any time for any reason or no reason.

          (d)     This Agreement has been examined by the parties hereto, and accordingly the rule of construction that ambiguities be construed against a party which causes a document to be drafted shall have no application in the construction or interpretation hereof. If any part of this Agreement is held invalid for any reason, the remainder hereof shall nevertheless remain in full force and effect.

          (e)     This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and any prior understanding or representation of any kind antedating this Agreement concerning such subject matter shall not be binding upon either party except to the extent incorporated herein. No consent, waiver, modification or amendment hereof, or additional obligation assumed by either party in connection herewith, shall be binding unless evidenced by a writing signed by both parties and referring specifically hereto. No consent, waiver, modification or amendment with respect hereto shall be construed as applicable to any past or future events other than the one in respect of which it was specifically made.

4

(f)     This Agreement shall be construed consistent with the provisions of the Plan and in the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control and any terms of this Agreement which conflict with Plan terms shall be void.

Questions concerning the provisions of this Agreement should be directed to the Company's Corporate Secretary:  630/227‑2050; fax 630/227‑2059.

*****************

By accepting this Agreement, you irrevocably agree to be bound by the terms hereof.  To accept this Agreement, please follow the procedures set forth below:

Step 1:   View your Award Summary (confirm that the number of shares awarded matches that shown in the Award grant letter you received from the Company)..  .

Step 2:   Read and review the documentation.

Step 3:   Confirm and review/acceptance of your Award and this Agreement.

Step 4:   Receive an online confirmation of your acceptance.

EXHIBIT C

# ORIGINAL

AAR'S COPY

AAR CONTRACT NO.
0 3 5 4 6

## SEVERANCE AND CHANGE IN CONTROL AGREEMENT

This Severance and Change in Control Agreement ("Agreement") made and entered into as of the 14th day of January, 2000, by and between AAR CORP., a Delaware corporation ("Company"), and James J. Clark ("Employee").

WHEREAS, the Company currently employs Employee as an employee at will in the capacity of Vice President; and

WHEREAS, Employee desires the Company to pay Employee certain severance payments upon a Change in Control of AAR CORP. and upon termination of employment prior to a Change in Control; and

WHEREAS, the Company is willing to pay Employee severance payments under certain circumstances if Employee agrees to confidentiality, non-compete and certain other covenants.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth and other good and valuable consideration, the parties hereto agree as follows:

1.  <u>Employment</u>. Employee will continue employment with the Company as an at will employee subject to the terms and conditions hereinafter set forth.

2.  <u>Duties</u>. During the continuation of his employment, Employee shall:

    (a)   well and faithfully serve the Company and do and perform assigned duties and responsibilities in the ordinary course of his employment and the business of the Company (within such limits as the Company may from time to time prescribe), professionally, faithfully and diligently.

    (b)   devote his full time, energy and skill to the business of the Company and his assigned duties and responsibilities, and to the promotion of the best interests of the Company; provided that Employee shall not (to the extent not inconsistent with Section 4 below) be prevented from (a) serving as a director of any corporation consented to in advance in writing by the Company, (b) engaging in charitable, religious, civic or other non-profit community activities, or (c) investing his personal assets in such form or manner as will not require any substantial services on his part in the operation or affairs of the business in which such investments are made or which would detract from or interfere or cause a conflict of interest with performance of his duties hereunder.

    (c)   observe all policies and procedures of the Company in effect from time to time applicable to employees of the Company including, without limitation, policies with respect to employee loyalty and prohibited conflicts of interest.

3.    Confidential Information, Assignment of Inventions.

(a)    Employee acknowledges that the trade secrets, confidential information, secret processes and know-how developed and acquired by AAR CORP. and its affiliates or subsidiaries (together the "Affiliated Companies") are among their most valuable assets and that the value of such information may be destroyed by unauthorized disclosure. All such trade secrets, confidential information, secret processes and know-how imparted to or learned by Employee in the course of his employment with respect to the business of the Affiliated Companies (whether acquired before or after the date hereof) will be deemed to be confidential and will not be used or disclosed by Employee, except to the extent necessary to perform his duties and, in no event, disclosed to anyone outside the employ of the Affiliated Companies and their authorized consultants and advisors, unless (i) such information is or has been made generally available to the public, (ii) disclosure of such information is required by law in the opinion of Employee's counsel (provided that written notice thereof is given to Company as soon as possible but not less than 24 hours prior to such disclosure), or (iii) express written authorization to use or disclose such information has been given by the Company. If Employee ceases to be employed by the Company for any reason, he shall not take with him any electronically stored data, documents or other papers containing or reflecting trade secrets, confidential information, secret processes, know-how, or computer software programs. Employee acknowledges that his employment hereunder will place him in a position of utmost confidence and that he will have access to confidential information concerning the operation of the business of the Affiliated Companies, including, but not limited to, manufacturing methods, developments, secret processes, know-how, computer software programs, costs, prices and pricing methods, sources of supply and customer names and relations. All such information is in the nature of a trade secret and is the sole and exclusive property of the Affiliated Companies and shall be deemed confidential information for the purposes of this paragraph.

(b)    Employee hereby assigns to the Company all rights that Employee may have as author, designer, inventor or otherwise as creator of any written or graphic material, design, invention, improvement, or any other idea or thing whatever that Employee may write, draw, design, conceive, perfect, or reduce to practice during employment with the Company or within 120 days after termination of such employment, whether done during or outside of normal work hours, and whether done alone or in conjunction with others ("Intellectual Property"), provided, however, that Employee reserves all rights in anything done or developed entirely by Employee on Employee's own personal time and without the use of any Company equipment, supplies, facilities or information, or the participation of any other Company employee, unless it relates to the Company's business or reasonably anticipated business, or grows out of any work performed by Employee for the Company. Employee will promptly disclose all such Intellectual Property developed by Employee to the Company, and fully cooperate at the Company's request and expense in any efforts by the Company or its assignees to secure protection for such Intellectual Property by way of domestic or foreign patent, copyright, trademark or service mark registration or otherwise,

2

including executing specific assignments or such other documents or taking such further action as may be considered necessary to vest title in Company or its assignees and obtain patents or copyrights in any and all countries.

4.  Non-Compete; Severance.

(a)  Employee agrees that during his continuation of employment with the Company and for one (1) year thereafter so long as the Company makes severance payments to Employee pursuant to subsections 4(b) or 4(c) below, he shall not, without the express written consent of the Company, either alone or as a consultant to, or partner, employee, officer, director, or stockholder of any organization, entity or business, (i) take or convert for Employee's personal gain or benefit or for the benefit of any third party, any business opportunities which may be of interest to the Company or any Affiliated Company which Employee becomes aware of during the term of his employment; (ii) engage in direct or indirect competition with the Company or any Affiliated Company within 100 miles of any location within the United States of America or any other country where the Company or any Affiliated Company does business from time to time during the term hereof; (iii) solicit in connection with any activity which is competitive with any of the businesses of the Company or any Affiliated Company, any customers of the Company or any Affiliated Company; (iv) solicit for employment any sales, marketing or management employee of Company or any Affiliated Company or induce or attempt to induce any customer or supplier of the Company or any Affiliated Company to terminate or materially change such relationship. Company and Employee acknowledge the reasonableness of the foregoing covenants not to compete and non-solicitation, including but not limited to the geographic area and duration of time which are a part hereof, and further, that the restrictions stated in this Section 4 are reasonably necessary for the protection of Employer's legitimate proprietary interests. This covenant not to compete may be enforced with respect to any geographic area in which the Company or any Affiliated Company does business during the term hereof. Nothing herein shall prohibit Employee from being the legal or equitable holder, solely for investment purposes, of less than 5% of the capital stock of any publicly held corporation which may be in direct or indirect competition with the Company or any Affiliated Company.

(b)  The Company will pay Employee, upon termination of Employee's employment by the Company prior to a Change in Control (as defined in 6(c)(i) below) for any reason other than Cause (as defined in 6(c)(iv) below), severance each month for 12 months, in an amount (subject to applicable withholding) equal to 1/12 of Employee's base salary; and, further, if the Company pays discretionary bonuses to its officers for the fiscal year in which Employee's employment is terminated, Employee will be paid a bonus in a lump sum at the time any such bonuses are paid to other officers or at such time as the Severance Period is complete, whichever is later (with interest at prime rate plus one percentage point from the earlier of such dates), (1) for the completed fiscal year preceding termination if such bonus has not been paid prior to termination, and (2) for the fiscal year in which employment is terminated, prorata for the period prior to termination of

3

employment based on Employee's performance during such period; provided, however, that (i) all such monthly payment obligations shall terminate immediately upon Employee obtaining full time employment in a comparable position in terms of salary level, and (ii) all such payment obligations shall terminate or lapse immediately upon any breach by Employee of Section 3 or 4(a) of this Agreement or if Employee shall commence any action or proceeding in any court or before any regulatory agency arising out of or in connection with termination of his employment.

(c)     If Employee terminates his employment or Employee's employment is terminated by the Company for Cause (as defined below), the Company may elect (but is not required to), by written notice thereof to Employee, within five (5) days of any such termination of Employee's employment with the Company prior to a Change in Control (as defined below), to pay Employee severance as provided in and subject to the provisions of subsection 4(b) above.

(d)     Employee may terminate this Severance and Change in Control Agreement effective immediately upon notice thereof in writing to Company at any time while still employed within a sixty (60) calendar day period immediately following the effective date of any reduction by Company in (i) Employee's level of responsibility or position from that held by Employee as Vice President on the effective date of this Agreement, or (ii) Employee's level of compensation, including retirement benefits in effect immediately prior to any such change.

(e)     If at any time, any clause or portion of this Section 4 shall be deemed invalid or unenforceable by the laws of the jurisdiction in which it is to be enforced by reason of being vague or unreasonable as to duration, geographic scope, nature of activities restricted, or for any other reason, this provision shall be considered divisible as to such portions and the foregoing restrictions set forth in 4(a) shall become and be immediately amended to include only such duration, scope or restriction and such event as shall be deemed reasonable and enforceable by the court or other body having jurisdiction to enforce this Agreement; and the parties hereto agree that the restrictions, as so amended, shall be valid and binding as though the invalid or unenforceable portion had not been involved herein.

(f)     The Employee acknowledges and agrees that the Company would be irreparably harmed by violations of Section 3 or Section 4(a) above, and in recognition thereof, the Company shall be entitled to an injunction or other decree of specific performance with respect to any violation thereof (without any bond or other security being required) in addition to other available legal and equitable remedies.

5.     Termination of Employment.

(a)     Upon and after termination of employment howsoever arising, Employee shall, upon request by Company:

4

(1)    immediately return to the Company all correspondence, documents, business calendars/diaries, or other property belonging to the Company which is in his possession,

(2)    immediately resign from any office Employee holds with the Company or any Affiliated Company; and

(3)    cooperate fully and in good faith with the Company in the resolution of all matters Employee worked on or was involved in during Employee's employment with the Company. Employee's cooperation will include reasonable consultation by telephone. Further, in connection therewith, Employee will, at Company's request upon reasonable advance notice and subject to Employee's availability, make himself available to Company in person at Company's premises, for testimony in court, or elsewhere; provided, however, that in such event, Company shall reimburse all Employee's reasonable expenses and pay Employee a reasonable per diem or hourly stipend.

6.    <u>Change in Control.</u>

(a)    In the event (i) a Change in Control of AAR CORP. occurs and (ii) (A) at any time during the 24 month period commencing on the date of the Change in Control the Company terminates Employee's employment for other than Cause or Disability, or Employee terminates his employment for Good Reason, in either case by written notice to the other party (including the particulars thereof), and having given the other party the opportunity to be heard with respect thereto, or (B) Employee's employment with the Company terminates for any reason other than Disability or death during the 30 day period commencing on the expiration of the aforementioned 24 month period, then:

(1)    The Company shall promptly pay to Employee, in a lump sum, a cash payment in an amount equal to the sum of (A) all base salary earned through the date of termination, (B) any annual cash bonus earned by Employee for the fiscal year of the Company most recently ended prior to the date of termination to the extend unpaid on the date of termination, (C) a prorata portion of the annual cash bonus, including the value of any restricted stock grant in lieu of annual cash bonus, Employee would have earned had he been employed by the Company on the last day of the fiscal year in which the date of termination occurs (as if all performance targets have been met or, in the event the bonus is of the "discretionary" type, the bonus shall be based on a percentage of base salary which is not less than percentage of base salary received as bonus for the preceding fiscal year) that is applicable to the period commencing on the first day of such fiscal year and ending on the date of termination, and (D) any and all other benefits and amounts earned by Employee prior to the date of termination to the extent unpaid, all subject to applicable withholding.

5

(2)    The Company shall promptly pay to Employee in a lump sum, a cash payment in an amount equal to three times Employee's total compensation (base salary plus annual cash bonus) for either the fiscal year of the Company most recently ended prior to the date of termination, or the preceding fiscal year, whichever is the highest total compensation, subject to applicable withholding. Employee may elect to take payment of any amounts on a schedule of his own choosing; provided that such schedule shall be completed no later than three years from the date of Employee's termination of employment.

(3)    Employee and his dependents shall continue to be covered by, and receive benefits, in accordance with the terms, all of the Company's medical, dental and life insurance plans for three years following the date of termination, and at no less than the levels he and his dependents were receiving immediately prior to the Change in Control. Employee's dependents shall be entitled to continued coverage pursuant to the preceding sentence for the balance of such three year period in the event of Employee's death during such period. The period during which Employee and his dependents are entitled to continuation of group health plan coverage pursuant to Section 4980B of the Internal Revenue Code of 1986, as amended, and Part 6 of Title I of the Employee Retirement Income Security Act of 1974, as amended, shall commence on the date next following the expiration of the aforementioned three year period.

(4)    Employee shall receive an additional retirement benefit, over and above that which Employee would normally be entitled to under the Company's retirement plans or programs applicable to Employee, equal to the actuarial equivalent of the additional amount that Employee would have earned under such retirement plans or programs had he accumulated three additional continuous years of service. Such amount shall be paid to Employee in a cash lump sum payment on the Employee's Retirement Date.

(5)    The Company, at its expense, shall provide Employee with outplacement services of a nationally recognized outplacement firm until the earlier of (a) the Employee's attainment of employment, or (b) the date eighteen (18) months from the date of Employee's termination of employment; provided, however, that the cost of such outplacement services shall not exceed 3.5% of the cash payment due to Employee pursuant to subsection 6(a)(2) above.

(6)    The amounts paid to Employee under this Change in Control provision applicable to Employee shall be considered severance pay in consideration of past service Employee has rendered to the Company and in consideration of Employee's continued service from the date hereof to entitlement of those payments.

(b)    In the event that a Change in Control occurs, whether or not such Change in Control has the prior written approval of a majority of the Continuing Directors

(as defined in the AAR CORP. Stock Benefit Plan), and notwithstanding any conditions or restrictions contained in any agreement between the Company and Employee related to any Award granted to Employee under the Plan, all Options or Limited Rights, or both, granted to Employee under the Plan will become immediately exercisable, and all restrictions on Restricted Stock granted to Employee under the Plan will immediately lapse.

(c)     For purposes of this Agreement

    (i)     "Change in Control" means the earliest of:

         (1)     any person (as such term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), has acquired (other than directly from the Company) beneficial ownership (as that term is defined in Rule 13d-3 under the Exchange Act), of more than 20% of the outstanding capital stock of the Company entitled to vote for the election of directors; or

         (2)     the effective time of (i) a merger or consolidation or other business combination of the Company with one or more other corporations as a result of which the holders of the outstanding voting stock of the Company immediately prior to such business combination hold less than 60% of the voting stock of the surviving or resulting corporation, or (ii) a transfer of substantially all of the assets of the Company other than to an entity of which the Company owns at least 80% of the voting stock; or

         (3)     the election over any period of time to the Board of Directors of the Company without the recommendation or approval of the incumbent Board of Directors of the Company, of the lesser of (i) three directors, or (ii) directors constituting a majority of the number of directors of the Company then in office.

    (ii)     "Good Reason" means:

         (1)     a material reduction in the nature or scope of Employee's duties, responsibilities, authority, power or functions from those enjoyed by Employee immediately prior to the Change in Control, or a material reduction in Employee's compensation (including benefits), occurring at any time during the two-year period immediately after the Change in Control; or

         (2)     if the incumbent in the position of President and CEO of the Company on August 8, 1997 is not the President and CEO of the Company at the time of termination, a good faith determination by Employee that as the result of a Change in Control and a material change in employment circumstances at any time during the immediate two year period after the Change in Control, he is

unable to carry out his assigned duties and responsibilities in a manner consistent with the practices, standards, values or philosophy of the Company immediately prior to the Change in Control; or

(3) a relocation of the primary place of employment of at least 100 miles.

(iii) "Disability" means:

(1) a physical or mental condition which has prevented Employee from substantially performing his assigned duties for a period of 180 consecutive days and which is expected to continue to render Employee unable to substantially perform his duties on a full-time basis and otherwise meets the benefit eligibility requirements of the Company's Long Term Disability Welfare Benefit Plan. The Company will make reasonable accommodation for any handicap of Employee as may be required by applicable law.

In the event of termination by the Company for Disability after a Change in Control, a good faith determination of the existence of a Disability shall be made by resolution of the Compensation Committee of the Board of Directors of the Company, in its sole discretion, setting forth the particulars of the Disability which shall be final and binding upon the Employee. The Company may require the submission of such medical evidence as to the condition of the Employee as it may deem necessary in order to arrive at its determination of the occurrence of a Disability, and Employee will cooperate in providing any such information. Employee will be provided with reasonable opportunity to present additional medical evidence as to the medical condition of Employee for consideration prior to the Board making its determination of the occurrence of a Disability.

Upon termination of Employment by Company for Disability after a Change in Control, Employee will receive Disability payments pursuant to the Company's short and long term Disability welfare benefit plans then in effect according to the terms of such plans and continue to be eligible to participate in the Company's medical, dental and life insurance programs then in effect and available to officers of the Company in accordance with their terms for a period of 3 years from the date of such termination of this Agreement.

(iv) "Cause" means:

(1) Employee engages, during the performance of his duties hereunder, in acts or omissions constituting dishonesty, intentional breach of fiduciary obligation or intentional wrongdoing or malfeasance;

8

(2)     Employee intentionally disobeys or disregards a lawful and proper direction of the Board or the Company; or

(3)     Employee materially breaches the Agreement and such breach by its nature, is incapable of being cured, or such breach remains uncured for more than 10 days following receipt by Employee of written notice from the Company specifying the nature of the breach and demanding the cure thereof. For purposes of his clause (3), a material breach of the Agreement that involves inattention by Employee to his duties under the Agreement shall be deemed a breach capable of cure.

Without limiting the generality of the foregoing, the following shall not constitute Cause for the termination of employment of Employee or the modification or diminution of any of his authority hereunder:

(1)     any personal or policy disagreement between Employee and the Company or any member of the Board; or

(2)     any action taken by Employee in connection with his duties hereunder, or any failure to act, if Employee acted or failed to act in good faith and in a manner he reasonably believed to be in and not opposed to the best interest of the Company and he had no reasonable cause to believe his conduct was unlawful; or

(3)     termination of Employee's employment for overall unsatisfactory performance (including, but not limited to, failure to meet financial goals).

Termination for Cause shall be limited to a good faith finding by resolution of the Compensation Committee of the Board, setting forth the particulars thereof. Any such action shall be taken at a regular or specially called meeting of the Compensation Committee of the Board, after a minimum 10 days notice thereof to Employee, with termination of Employee's employment with the Company for Cause listed as an agenda item. Employee will be given a reasonable opportunity to be heard at such meeting with counsel present if Employee desires. Any such resolution shall be final and binding.

Upon termination of employment by Company for Cause, no further compensation or benefits shall accrue or be payable to Employee by the Company, except for any compensation, bonus or other benefits which have accrued to Employee prior to the date of any such termination.

Nothing herein shall be construed to prevent the Company from terminating Employee's employment at any time for any reason or for no reason.

9

(d)     The Company will pay reasonable legal/attorney's fees incurred by Employee in connection with enforcement of any right or benefit under this Section 6.

(e)     The Company shall promptly pay Employee a gross-up bonus in an amount equal to (i) all excise taxes payable under Section 280G of the Internal Revenue Code on any amounts constituting "golden parachute" payments, plus (ii) any federal, state, and local income taxes and excise taxes (including FICA) payable by Employee on such gross-up bonus in order to put Employee in the same position he would have been in if the excise tax provision (Section 280G) did not apply.

7.     <u>Changes in Business</u>. The Company, acting through its Board of Directors, will at all times have complete control over the Company's business and retirement and other employee health and welfare benefit plans ("Plans"). Without limiting the generality of the foregoing, the Company may at any time or times change or discontinue any or all of its present or future operations or Plans (subject to their terms), may close or move any one or more of its divisions or offices, may undertake any new servicing or sales operation, may sell any one or more of its divisions or offices to any company not controlled, directly or indirectly, by the Company or may take any and all other steps which its Board of Directors, in its exclusive judgment, shall deem desirable, and Employee shall have no claim or recourse against the Company, its officers, directors or employees by reason of such action except for enforcement of the provisions of Sections 4 and 6 of this Agreement.

8.     <u>Severance Payment as Sole Obligation</u>. Except as expressly provided in Sections 4 and 6 above, no further compensation, payments, liabilities or benefits shall accrue or be payable to Employee upon or as a result of termination of Employee's employment for any reason whatsoever except for any compensation, bonus or other benefits which accrued to Employee prior to the date of employment termination.

The amounts paid to the Employee under Section 4 and 6 of this Agreement shall be considered severance pay in consideration of past services Employee has rendered to the Company and in consideration of Employee's continued service from the date hereof to entitlement to those payments.

9.     <u>Notices</u>. Any notice or other instrument or thing required or permitted to be given, served or delivered to any of the parties hereto shall be delivered personally or deposited in the United States mail, with proper postage prepaid, telegram, teletype, cable or facsimile transmission to the addresses listed below:

(a)     If to the Company, to:

AAR CORP.
1100 N. Wood Dale Road
Wood Dale, Illinois 60191
Attention: Chairman

With a copy to:

AAR CORP.
1100 N. Wood Dale Road
Wood Dale, Illinois  60191
Attention:  General Counsel

(b)    If to Employee, to:

James J. Clark
Singel 326, 1016 AE
Amsterdam, The Netherlands

or to such other address as either party may from time to time designate by notice to the other.  Each notice shall be effective when such notice and any required copy are delivered to the applicable address.

10.    <u>Non-Assignment</u>.

(a)    The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of Employee, and any attempted unpermitted assignment shall be null and void and without further effect; provided, however, that, upon the sale or transfer of all or substantially all of the assets of the Company, or upon the merger by the Company into or the combination with another corporation or other business entity, or upon the liquidation or dissolution of the Company, this Agreement will inure to the benefit of and be binding upon the person, firm or corporation purchasing such assets, or the corporation surviving such merger or consolidation, or the shareholder effecting such liquidation or dissolution, as the case may be.  After any such transaction, the term Company in this Agreement shall refer to the entity which conducts the business now conducted by the Company.  The provisions of this Agreement shall be binding upon and inure to the benefit of the estate and beneficiaries of Employee and upon and to the benefit of the permitted successors and assigns of the parties hereto.

(b)    The Employee agrees on behalf of himself, his heirs, executors and administrators, and any other person or person claiming any benefit under him by virtue of this Agreement, that this Agreement and all rights, interests and benefits hereunder shall not be assigned, transferred, pledged or hypothecated in any way by the Employee or by any beneficiary, heir, executor, administrator or other person claiming under the Employee by virtue of this Agreement and shall not be subject to execution, attachment or similar process.  Any attempted assigned, transfer, pledge or hypothecation or any other disposition of this Agreement or of such rights, interests and benefits contrary to the foregoing provisions or the levy or any execution, attachment or similar process thereon shall be null and void and without further effect.

11

11.    <u>Severability</u>. If any term, clause or provision contained herein is declared or held invalid by any court of competent jurisdiction, such declaration or holding shall not affect the validity of any other term, clause or provision herein contained.

12.    <u>Construction</u>. Careful scrutiny has been given to this Agreement by the Company, Employee, and their respective legal counsel. Accordingly, the rule of construction that the ambiguities of the contract shall be resolved against the party which caused the contract to be drafted shall have no application in the construction or interpretation of this Agreement or any clause or provision hereof.

13.    <u>Entire Agreement</u>. This Agreement and the other agreements referred to herein set forth the entire understanding of the parties and supersede all prior agreements, arrangements and communications, whether oral or written, pertaining to the subject matter hereof.

14.    <u>Waiver</u>. No provision of this Agreement may be amended, modified, waived or discharged unless such amendment, modification, waiver or discharge is agreed to in writing signed by Employee and an authorized officer of the Company. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

15.    <u>Governing Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without regard to its conflicts of law principles.

16.    <u>Execution</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and which shall constitute but one and the same Agreement.

WITNESS the due execution of this Agreement by the parties hereto as of the day and year first above written.

Employer:

AAR CORP.

By: _____

Title: Vice President

Employee:

_____
James J. Clark

12

ORIGINAL

AAR'S COPY

AAR Contract No.

0 6 5 4 6 - 1

**FIRST AMENDMENT TO
SEVERANCE AND CHANGE IN CONTROL AGREEMENT
OF JAMES J. CLARK**

This First Amendment to the Severance and Change in Control Agreement is made and entered into on December 15, 2008, by and between AAR CORP., a Delaware corporation (the "Company"), and James J. Clark (the "Employee").

**WHEREAS**, the Company and the Employee are parties to a Severance and Change in Control Agreement dated as of January 14, 2000 (the "Agreement") and now desire to amend the Agreement to comply with Internal Revenue Code Section 409A and the guidance and regulations thereunder, to the extent applicable.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows, effective as of the date hereof:

1. By amending Section 6(a)(1) to delete the reference to "promptly" and replace with ", within 30 days following such termination of employment,".

2. By amending Section 6(a)(2) to read as follows:

   The Company shall, within 30 days following such termination of employment, pay to Employee in a lump sum, a cash payment in an amount equal to three times Employee's total compensation (base salary plus annual cash bonus) for either the fiscal year of the Company most recently ended prior to the date of termination, or the preceding fiscal year, whichever is the highest total compensation, subject to applicable withholding; provided, however, that the Employee may elect to have payment of any such amounts be made on a schedule of Employee's own choosing, provided that such schedule shall be completed no later than three years from the date of Employee's termination of employment.

3. By amending Section 6(e) to delete the reference to "promptly" and to add a second sentence to read as follows:

   The gross-up bonus shall be paid within 30 days after Employee remits the related excise tax or other amounts to the appropriate taxing authority.

4. By adding a new Section 17 to read as follows:

   18. Provisions Regarding Code §409A.

   (a) If at the time of the Employee's termination of employment for reasons other than death he is a "Key Employee" as determined in accordance with the procedures set forth in Treas. Reg. §1.409A-1(i), any amounts payable to the Employee pursuant to this Agreement that are subject to Section

409A of the Internal Revenue Code shall not be paid or commence to be paid until six months following the Employee's termination of employment, or if earlier, the Employee's subsequent death.

(b)     Reimbursements or in-kind benefits provided under this Agreement that are subject to Section 409A of the Internal Revenue Code are subject to the following restrictions:   (1) the amount of expenses eligible for reimbursements, or in-kind benefits provided, to the Employee during a calendar year shall not affect the expenses eligible for reimbursement or the in-kind benefits provided in any other calendar year, and (2) reimbursement of an eligible expense shall be made as soon as practicable, but in no event later than the last day of the calendar year following the calendar year in which the expense was incurred.

**WITNESS WHEREOF**, the parties have executed this First Amendment as of the date first written above.

                    AAR CORP.

                    By:    _Robert J. Regan_
                    Its:    Vice President and General Counsel


                    JAMES J. CLARK

                    _____

2

# EXHIBIT D


**AAR CORP.**

August 11, 2006

Mr. James J. Clark
433 E. North Water St.
Chicago, IL 60611

Dear Jim:

Consistent with current equity compensation trends, the Compensation Committee of the
Board of Directors has approved a Long-Term Performance Restricted Stock Award
("RSA") Program ("Program") covering the period June 1, 2006 through May 31, 2008
(FY2007 and FY2008).

I am pleased to advise you that, in recognition of your commitment to excellence and
your contribution as a key employee, as well as an endorsement of your ability to
influence the results of AAR, you have the opportunity to receive an award of up to
30,000 shares of restricted stock under the Program. A detailed description of the
Program is enclosed for your information. We do not anticipate offering any other equity
compensation award program until after completion of the Program at the end of
FY2008.

The Program provides for RSAs to be awarded upon achievement of specified
Consolidated Net Income and Return on Invested Capital ("ROIC") targets, or,
alternatively, upon a 130% increase in stock price. Thirty-three percent (33%) of your
award opportunity is issued based on Company performance during fiscal 2007, thirty-
three percent (33%) of your award opportunity is based on Company performance during
fiscal 2008, and thirty-four percent (34%) during the combined fiscal 2007 and 2008
performance period. Alternatively, if the average New York Stock Exchange (NYSE")
closing price of AAR common stock equals or exceed $31.30 for any twenty (20)
consecutive trading days during the period June 1, 2006 through May 31, 2008, any
portion of your opportunity not already granted will be granted immediately.

Under the Program, RSA shares are granted at the end of each performance period based
on eligibility and performance against goals or upon meeting the stock price increase
target. Restrictions on granted shares are scheduled for release 20% on June 1, 2009,
40% on June 1, 2011, and 40% on June 1, 2013, regardless of the date granted (shares
granted are subject to forfeiture if certain circumstances occur prior to release of
restrictions).

To be eligible to receive a grant for any performance period, you must be employed by AAR on the last day of the performance period and you must have signed an RSA agreement in the form required under the Program. You will be furnished with an appropriate RSA agreement promptly following each performance period in accordance with the terms of the Program.

Congratulations on your award opportunity! I look forward to working with you and other key employees as a team, to ensure that we make our Company a continued success and exceed the Program's Income and ROIC targets. I know I can continue to count on you to deliver cost-effective value and solutions to our customers through dedication to teamwork and flawless daily execution. Success in these efforts will strengthen our position in the market and ultimately drive increased shareholder value. Thank you for your ongoing contributions and focus on delivering on your commitments.

Sincerely,

David P. Storch
Chairman, President & Chief Executive Officer

Enclosure

# EXHIBIT E

 **AAR CORP.**

David P. Storch
Chairman & Chief Executive Officer

July 14, 2008

Mr. James J. Clark
433 E. North Water Street
Chicago, IL 60611

Dear Jim:

Consistent with current equity compensation trends, the Compensation Committee of the Board of Directors approved a Long-Term Performance Restricted Stock Award ("RSA") Program ("Program") covering the period June 1, 2008 through May 31, 2010 (FY2009 and FY2010).

I am pleased to advise you that, on May 27, 2008 the Compensation Committee of the Board of Directors approved an opportunity for you to receive an award of up to 35,000 shares of restricted stock under the Program. A detailed description of the Program is enclosed for your information. We do not anticipate offering any other equity compensation award program until after completion of the Program at the end of FY2010.

The Program provides for RSAs to be awarded upon achievement of specified Consolidated Net Income and Long-term Recourse Net Debt to Capital Ratio targets, or, alternatively, upon a 130% increase in stock price. Thirty-three percent (33%) of your award opportunity is issued based on Company performance during fiscal 2009, thirty-three percent (33%) of your award opportunity is based on Company performance during fiscal 2010, and thirty-four percent (34%) during the combined fiscal 2009 and 2010 performance period. Alternatively, if the average New York Stock Exchange ("NYSE") closing price of AAR common stock equals or exceed $25.06 for any twenty (20) consecutive trading days during the period June 1, 2008 through May 31, 2010, any portion of your opportunity not already granted will be granted immediately.

Under the Program, RSA shares are granted at the end of each performance period based on eligibility and performance against goals or upon meeting the stock price increase target. Restrictions on granted shares are scheduled for release 20% on June 1, 2011, 40% on June 1, 2013, and 40% on June 1, 2015, regardless of the date granted (shares granted are subject to forfeiture if certain circumstances occur prior to release of restrictions).

To be eligible to receive a grant for any performance period, you must be employed by AAR on the last day of the performance period and you must accept an RSA agreement in the form required under the Program. (The RSA agreement for each performance period, including the terms and conditions of the Program, will be made available on the Smith Barney website.)

One AAR Place · 1100 N. Wood Road · Wood Dale, IL 60191 · Phone (630) 227-2000

 **AAR°**

Mr. James J. Clark
July 14, 2008
Page 2

Congratulations on your award opportunity!  The next few years will be a challenge, but as a Company we have been through uncertain times before and each time we emerged stronger.  We must remain focused on strengthening our balance sheet, controlling costs and providing innovative solutions for our customers.  The diversification strategy we have in place has positioned us to seize new opportunities to grow our business and to stand out as a key player within the industry.  With your energy, experience and commitment I am confident that as a team we can exceed the Program's Income and Long-term Recourse Net Debt to Capital Ratio targets.

Sincerely,

David P. Storch
Chairman & Chief Executive Officer

DPS/fmd
Enclosures

# EXHIBIT F

> ----- Original Message -----
> From: David Storch
> Sent: Friday, August 20, 2010 09:28 AM
> To: Jim Clark
> Cc: Tim Romenesko
> Subject: Re: Short update
>
> Great job Jim. Good news!! Let's keep at it!! This kind of daily progress should make the Thursday meeting go smoother.
>
> ----- Original Message -----
> From: Jim Clark
> To: David Storch
> Sent: Fri Aug 20 09:04:17 2010
> Subject: Short update
>
> Brian's tiger team found 10 parts last night that previously had no EDDs.
>
> Also found the carpet on the pre-draw. Was sitting on a Boeing back order. Attempting to get that transferred over to NG.
>
> Found one pre-draw lens. Using that to send to PMA to revirse engineer.
>
> Total shortage list from yesterday reported the first time we were below 100 parts.
>
> Cruze found three DERs from the FAA database that matched the NG requirements. Passed that on to NG this morning.
>
> IT pulling together quality metric info. Should have something to review today.
>
>
> Disclaimer:
> IMPORTANT - This E-Mail is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this E-mail is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly PROHIBITED. If you have received this communication in error, please immediately notify AAR CORP by e-mail and return the original message to us by e-mail. THANK YOU.
>
>

EXHIBIT G

> ----- Original Message -----
> From: David Storch
> Sent: Wednesday, February 16, 2011 09:16 AM
> To: Jim Clark
> Subject: Re:
>
> Thanks for the update. Good progress. Well done!!
>
> ----- Original Message -----
> From: Jim Clark
> Sent: Wednesday, February 16, 2011 09:05 AM
> To: David Storch
> Subject: Re:
>
> David,
>
> Met with them on Monday. The President and CFO are actually pretty solid. Neither Fokker lifers, and both came from other industries. Reviewed the rationale behind the rejecton of their first offer, then covered their growth strategy.
>
> They said that Candover has just a small group left managing the 2005 fund which Stork was a part of. Now they are pursuing a new aviation financing to separate the Fokker businesses from the other industrial parts of Stork. Presumably this is to fund capability expansion and acquisitions. They said that they are still very interested in buying our facility and have the support to do so.
>
> I built up a pro forma statement that demonstrates how they could get to a positive ebitda that would drive a price that would work for us. That discussion went fairly well. We also covered the land issues and different structures. They committed to give me a revised offer next week.
>
> Also spent a couple of days on a technical review with the outfit from California. That went well and they said they want to buy it. I expect some kind of offer next week.
>
> The French private equity firm asked if they could send over their two senior partners next week for another round.
>
> All parties believe that we have one firm, workable offer in hand, as well as an internal retention option that they have to get past.
>
> Fokker obviously remains the best option, so I'm going to keep pushing them and will try to extrat at least one other solid offer they'll have to compete with.
>

1

> Jim
>
>
>
> ----- Original Message -----
> From: David Storch
> Sent: Wednesday, February 16, 2011 06:04 AM
> To: Jim Clark
> Subject:
>
> Jim,
>
> How are you progressing with Fokker?
>
>
>
> Disclaimer:
> IMPORTANT - This E-Mail is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this E-mail is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that reading, disseminating, distributing or copying this communication is strictly PROHIBITED. If you have received this communication in error, please immediately notify AAR CORP by e-mail and return the original message to us by e-mail. THANK YOU.
>
>

No virus found in this message.
Checked by AVG - www.avg.com
Version: 10.0.1204 / Virus Database: 1435/3457 - Release Date: 02/21/11

# EXHIBIT H

**FRANKEL & COHEN**
53 WEST JACKSON BOULEVARD, SUITE 1615
CHICAGO, IL 60604

Phone: 312-759-9600
Fax:    312-697-0812

Email: rcohen@frankelandcohen.com

October 21, 2011

EEOC
500 W. Madison Street, Ste. 2000
Chicago, IL 60661

     Re:   James Clark v. AAR Corp.

Dear EEOC:

    Please find enclosed for filing the following charge of discrimination filed by James Clark against AAR Corp.  Please cross file this charge with the Illinois Department of Human Rights as per your work sharing agreement.

    Please contact Mr. Clark through me and send me all pleadings and other materials relating to this charge of discrimination.

            Sincerely,

            Robert R. Cohen

encs.

RECEIVED EEOC
OCT 21 2011
CHICAGO DISTRICT OFFICE

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

**Illinois Department of Human Rights** and EEOC
State or local Agency, if any

RECEIVED EEOC
OCT 21 2011
CHICAGO DISTRICT

| Name (Indicate Mr., Ms., Mrs.) | | Date of Birth |
|---|---|---|
| Mr. James Clark | | 7-3-1960 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 433 E. North Water St. | Chicago, IL 60611 | 312-645-3801 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| AAR Corp. | 15+ | 630-227-2000 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 1100 N. Wood Dale Road | Wood Dale, IL 60191 | |

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | Earliest  5-13-10   Latest  10-19-11 |
| ☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by AAR Corp. ("AAR") in 1982. Prior to June 1, 2010 I was a Group Vice President. I am 51 years old. I opposed age discrimination on or about May 14, 2010. On June 1, 2010 I was demoted and my base pay was cut. Since June 1, 2010, my compensation (including base pay, bonuses, and other benefits) have been cut. On or about June 21, 2011, I was discharged by AAR. I have been denied severance pay and other benefits including but not limited to stock awards to which I am entitled. Set forth below is a summary of the facts that support my claims. This charge does not purport to set forth all of the facts and/or evidence that supports my claims.

On May 13, 2010, Tim Romenesko, AAR's President and Chief Operating Officer, informed me that AAR was going to remove me from my position as Group Vice President effective June 1, 2010. When I asked Mr. Romenesko why AAR was removing me from my position, Mr. Romenesko said that AAR had to move me out of the way in order to make room for younger people like John Holmes (@ age 33), who will be with the company for the next twenty years so that AAR could focus on developing them. At that time, Mr. Romenesko told me that he was not sure whether I could continue to work in the company and that AAR would put together a separation agreement if AAR could not find something suitable for me to do.

Page 1 of 3

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10/19/11                    _____ Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

Illinois Department of Human Rights _____ and EEOC
*State or local Agency, if any*

THE PARTICULARS ARE  *(Continued from previous page):*

Shortly after this meeting, I complained about Mr. Romenesko's actions and comments to Tim Skelly, AAR's Vice President of Human Resources, who said that Mr. Romenesko's comments were clearly a basis for an age discrimination claim. I agreed and indicated that I believed the conduct constituted age discrimination.

On May 25, 2010, I was told that I could continue working at the company if I accepted a demotion and a salary cut with a capped bonus opportunity. My base and bonus pay have been reduced by varying amounts on a continuing basis since June, 1, 2010 based on my age. In addition, Mr. Holmes took over my quarterly reporting responsibilities to the Board of Directors and my annual reporting responsibilities to the company's investor base.

The jobs I was assigned after June 1, 2010 were significantly different than my prior position at the company. For example, my profit and loss responsibilities were eliminated and I did not have anyone directly reporting to me. My salary, bonus and stock award were reduced. The company attempted to get me to sign amended severance agreements designed to eliminate my right to significant amounts of restricted stock and other benefits that I had already earned.

I believe that AAR's course of conduct in demoting me, in cutting my pay, and in the manner in which AAR treated me after informing me that I would be demoted was designed to force me to resign by making conditions intolerable for me. In addition, I believe that AAR took these actions based on my age and opposition to age discrimination in the hope that I would resign so that AAR could use my resignation as a basis for denying me benefits earned and owed to me under the stock benefit plan and other retirement benefit plans.

On June 7, 2011, Mr. Romenesko told me that AAR really did not have a job for me anymore, and indicated that if I wanted to stay with the company I would have to accept a demotion and a large pay cut and that he could not think of what that job might be. On June 10, 2011, I met with Mr. Skelly and we discussed my employment status. I told him that based on Mr. Romenesko's comments, I believed that AAR wanted me to leave the company. I further told Mr. Skelly that I would be willing to enter into a separation agreement with AAR (as AAR had suggested in May of 2010), but that such agreement would be contingent on agreeing to terms that would ensure my receipt of all of the stock and other benefits which I had earned. I never told AAR I was resigning from my employment.

Page 2 of 3

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State or Local Agency Requirements* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct.<br><br>10/19/11<br>*Date*          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year )* |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

**Illinois Department of Human Rights** _____ and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page):*

On June 21, 2011, for the first time, AAR claimed that I offered to resign during my June 10th meeting with Mr. Skelly and that it accepted my resignation effective June 20, 2011. At that time, AAR took me off the payroll. I did not resign. Instead, I was discharged or, in the alternative, was constructively discharged. After my discharge, AAR has refused to pay me in accordance with a severance agreement I entered into in January of 2000 (as once amended). In addition, AAR has rescinded the stock I had previously earned under a stock benefit plan and indicated it will not payout certain bonuses and benefits that I had previously earned.

I believe that I was discriminated against with respect to my age, and in retaliation for my opposition to age discrimination, under the ADEA and the IHRA, in that I was demoted, received reduced compensation, was discharged (and/or constructively discharged), have been denied the severance pay to which I was contractually entitled, and have been stripped of stock and other benefits I previously earned.

**Page 3 of 3**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State or Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10/19/11 *Date*      *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year )* |